**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 11 2003**

**PATRICK FISH**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

OSCAR SCULL,

    Defendant-Appellant.

_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

GUS BONO,

    Defendant-Appellant.

No. 02-2025

No. 02-2035

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-00-1589 BB)**

---

Dorothy C. Sanchez of Albuquerque, New Mexico, for Defendant-Appellant Scull.

Kirtan K. Khalsa (Paul J. Kennedy with her on the briefs) of Kennedy & Han, P.C., Albuquerque, New Mexico, for Defendant-Appellant Bono.

Laura Fashing, Assistant U.S. Attorney (David Iglesias, United States Attorney), Albuquerque, New Mexico, for Plaintiff-Appellee in both cases.

---

Before **SEYMOUR**, **HOLLOWAY**[*] and **ANDERSON**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

---

Gus Bono and Oscar Scull were found guilty by a jury on a variety of counts relating to manufacturing, possessing, and distributing crack cocaine, and conspiracy to commit the same. *See* 18 U.S.C. §§ 2, 924(c)(1)(A)(i); 21 U.S.C. §§ 841(a)(1), (b)(1)(B), § 846, §§ 856(a)(1), (b). On appeal, Mr. Bono maintains his case should be remanded for a new trial due to a variety of alleged errors committed by the district court. He contends the court erred by failing to instruct the jury on his entrapment defense, by allowing charges to be brought against him which arose out of alleged outrageous government conduct, by improperly handling Mr. Bono's allegation of juror bias and taint, and by failing to submit to the jury the question of Mr. Bono's prior convictions for sentencing purposes. Mr. Scull argues on appeal that the government did not present sufficient evidence to prove he was guilty of the charges against him. Because Mr. Bono's and Mr. Scull's cases arise out of the same set of facts, we consolidate their

---

[*]The Honorable William J. Holloway, Jr., was vouched in for the oral arguments in these matters since he was not able to be present.

-2-

appeals for the purposes of this disposition. We affirm.[1]

# I

While federal agent Bryan Shields was working undercover as part of an illegal drug distribution investigation, he was introduced to Mr. Bono by a confidential informant. Through his contacts with Mr. Bono, Agent Shields entered into five different drug transactions with Mr. Bono, Mr. Scull and Jose Achon over a period of about six weeks.[2] Agent Shields ultimately bought a total of 85.2 grams of crack cocaine from these men. We will recite additional facts when relevant to the arguments on appeal.

## A. Entrapment

Mr. Bono first contends the district court erred in concluding the evidence was insufficient to support an entrapment defense and declining to provide the jury with such an instruction. We review the district court's determination *de novo*, *United States v. Ortiz*, 804 F.2d 1161, 1164 (10th Cir. 1986).

The entrapment defense exists to "protect an otherwise unpredisposed defendant from governmental coercion[,] . . . rais[ing] the issue of whether the criminal intent originated with the defendant or with government agents." *Id.* at

---

[1]We grant Mr. Bono's unopposed motion for leave to supplement the record.

[2]Mr. Achon, who also went by the name Daniel Balan-Gonzalez, was indicted along with Mr. Bono and Mr. Scull. However, the government was unable to arrest him and he was not tried.

1165. A defendant is "entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Mathews v. United States*, 485 U.S. 58, 62 (1988). "For the purposes of determining the sufficiency of the evidence to raise the jury issue, the testimony most favorable to the defendant should be accepted." *United States v. Reyes*, 645 F.2d 285, 287 (5th Cir. 1981); *see also Ortiz*, 804 F.2d at 1164. The defendant must show, either by presenting his own evidence or by pointing to evidence presented by the government in its case-in-chief, his lack of predisposition to commit the crime and "government involvement and inducement." *Ortiz*, 804 F.2d. at 1164-65. Because Mr. Bono did not present a defense, we must examine the government's evidence to determine whether sufficient facts existed to support an entrapment instruction.

Our record review persuades us the evidence does not support Mr. Bono's contention that he was induced by the government to engage in illegal drug transactions. "Inducement" is "government conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *Id.* at 1165. Government inducement of a defendant can occur through "persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *Id.* (quoting *United States v. Burkley*, 591 F.2d 903, 913 (D.C. Cir. 1978)). However,

"[e]vidence that a government agent solicited, requested or approached the defendant to engage in criminal conduct, standing alone, is insufficient to constitute inducement. Inducement is also not shown by evidence that the government agent initiated the contact with the defendant or proposed the crime." *Id.* (citation omitted).

When Mr. Bono and Agent Shields were first introduced to each other by the confidential informant, Mr. Bono willingly sold fifty dollars worth of crack cocaine to the agent. Because Agent Shields had expressed interest in buying $500 worth of the drug, Mr. Bono arranged to meet him later that day to sell him the full amount. At trial, Agent Shields testified that during this first transaction, Mr. Bono welcomed Agent Shields as a new customer, and outlined the terms and nature of their sales relationship. He gave Agent Shields his business card and wrote his cell phone number on it, stating it "was the best way to get in touch with him for future transactions." Rec., vol. IV at 103. Mr. Bono warned Agent Shields that he was not to bring anyone else with him when the two met for business, and threatened that if he ever saw someone with Agent Shields during a sales transaction, he would shoot him. He also told Agent Shields if he was ever "harassed or threatened or ripped off or robbed, that [Agent Shields] could come to him, and that he would take care of that." Rec., vol. IV at 105-06. Finally, Mr. Bono asked for Agent Shield's contact information so he could get in touch

with him.

Subsequent transactions between Mr. Bono and Agent Shields highlight the lack of government inducement to sell drugs. Agent Shields testified he would contact Mr. Bono to inquire as to another drug sale, they would set up a time to meet, and Mr. Bono would either arrive with a partner, or would send someone to consummate the sale with Agent Shields. When Mr. Bono indicated he was going to stop selling drugs for a while, he nonetheless took Agent Shields' number and said he would refer him to his partner. When Agent Shields contacted Mr. Bono a few weeks later, Mr. Bono said Agent Shields "would be happy that he was up and running again," rec., vol. V at 152, and later confirmed he was "back in business all the way." Rec., vol. V at 166.

In an effort to enhance his inducement argument, Mr. Bono asserts on appeal that the confidential informant who initially introduced Agent Shields to Mr. Bono harassed and induced him to sell drugs to the undercover agent. However, Mr. Bono did not present any direct evidence to this effect at trial, nor did the testimony elicited by the defense in its cross examination of government witnesses bring out this evidence. Rather, the record indicates Mr. Bono willingly entered into sales transactions with Agent Shields.

Similarly, Mr. Bono cannot point to evidence proving his lack of predisposition to commit the crimes charged against him. "Predisposition" is

defined "as a defendant's inclination to engage in the illegal activity for which he has been charged . . . [and] focuses on the defendant's state of mind before government agents suggest that he commit a crime." *Ortiz*, 804 F.2d at 1165. A defendant's predisposition to commit a particular crime "may be inferred from a defendant's history of involvement in the type of criminal activity for which he has been charged, combined with his ready response to the inducement offer." *Id.*

As set out above, Mr. Bono welcomed Agent Shields as a new customer and outlined the scope and nature of their sales relationship. When he was unable to immediately sell drugs to Agent Shields, Mr. Bono would arrange to meet the agent later, sometimes sending associates to sell the drugs. Mr. Bono also told Agent Shields he and his partner "made the crack cocaine themselves [and the agent] would get the same quality of crack cocaine" with each sale. Rec., vol. IV at 104. Similarly, when Agent Shields first met Mr. Bono at his auto shop, the agent observed another man enter the shop and saw "Gus Bono hand what appeared . . . to be . . . five crack rocks to this individual" in exchange for currency. Rec., vol. IV at 98. Government surveillance of Mr. Bono's auto shop also indicated "the traffic or the amount of people that were coming in and out of the business, arriving at the business, walking in, walking right back out and leaving[, was] consistent with drug transactions." Rec., vol. V at 343. This evidence demonstrates Mr. Bono's predisposition to sell drugs. He had

established drug business practices, served other drug customers at his auto shop, and indicated he was manufacturing cocaine with his partners. The district court correctly determined the evidence did not warrant an entrapment defense.

B. Outrageous Government Conduct

Mr. Bono also contends the government's continued investigation of him after his first sale of drugs to Agent Shields was solely to increase the charges against him, as well as his sentence. He maintains we should overturn his convictions on the subsequent drug sales he, Mr. Scull and Mr. Achon transacted with Agent Shields because the government's continued investigation amounted to outrageous government conduct and "sentencing entrapment."[3]

Because Mr. Bono did not raise the defense of outrageous government conduct below, we review only for plain error. In order to satisfy the plain error standard, Mr. Bono "must show: (1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affect[s] substantial rights. If [he] satisfies these criteria, this Court may exercise discretion to correct the error if it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Hughes*, 191 F.3d 1317, 1322 (10th Cir. 1999)

---

[3]Other courts have addressed this issue under the rubric "sentencing entrapment" or "sentencing factor manipulation." *See United States v. Lacey*, 86 F.3d 956, 963 (10th Cir. 1996) (listing cases). This court addresses the "same concept under the appellation of 'outrageous governmental conduct.'" *Id.* (quoting *United States v. Mosley*, 965 F.2d 906, 908, 914 (10th Cir. 1992)).

(citations and quotations omitted). Because we determine the government's behavior was not outrageous, Mr. Bono's ability to seek belated relief under this defense is precluded.

In *United States v. Russell*, 411 U.S. 423 (1973), the Supreme Court acknowledged that the conduct of law enforcement agents in the course of investigating an offense might be so outrageous "that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431-32. In determining whether the government has committed outrageous conduct, "the relevant inquiry is whether, considering the totality of the circumstances in any given case, the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice." *United States v. Lacey*, 86 F.3d 956, 964 (10th Cir. 1996) (quotations omitted). "[T]his is an extraordinary defense reserved for only the most egregious circumstances." *United States v. Mosley*, 965 F.2d 906, 910 (10th Circ. 1992).

The limited and circumscribed "nature of the outrageous conduct inquiry is due in primary part to the reluctance of the judiciary to second-guess the motives and tactics of law enforcement officials." *Lacey*, 86 F.3d at 964 (citing *Hampton v. United States*, 425 U.S. 484, 495-96 n.7 (1976) (Powell, J., concurring in judgment)). As a general matter, the government may need to complete several transactions with a defendant during the course of an undercover operation

because "[a]n undercover agent cannot always predict what information he will learn in the course of his investigation." *United States v. Harris*, 997 F.2d 812, 819 (10th Cir. 1993). Police must be given "leeway to probe the depth and extent of a criminal enterprise, to determine whether coconspirators exist, and to trace the drug deeper into the distribution hierarchy." *United States v. Calva*, 979 F.2d 119, 123 (8th Cir. 1992).

As we have said, Mr. Bono sold crack cocaine to Agent Shields and outlined the terms of their sales relationship at their first meeting. Mr. Bono also mentioned he had a partner named Oscar, and that he and his partner made the crack cocaine themselves. While Agent Shields could have arrested Mr. Bono after their first encounter, the agent was able to learn more about the scope of Mr. Bono's drug enterprise by maintaining an ongoing sales relationship with him. *See Lacey*, 86 F.3d at 964 (continuing investigation in attempt to break drug ring and secure conviction of defendant's coconspirators was legitimate law enforcement purpose).

About a week after their first encounter, Mr. Bono and Agent Shields arranged to meet for a second drug sale. Agent Shields testified that at this meeting Mr. Bono introduced Agent Shields to Mr. Scull stating: "This is Oscar, the other guy I was telling you about." Rec., vol. IV at 126. Mr. Scull seemed upset about Mr. Bono's introduction and Mr. Bono reintroduced him as "Mon" or

a name to that effect. *Id.* Mr. Scull then sold Agent Shields $500 worth of crack cocaine.

Agent Shields met Mr. Achon, a third member of the conspiracy, in a similar manner. Mr. Bono arrived at an arranged meeting driving what agents subsequently learned was Mr. Scull's car, accompanied by Mr. Achon. Mr. Bono introduced Mr. Achon as "his guy," rec., vol. V at 165, and Mr. Achon exchanged fifty rocks of crack cocaine with Agent Shields for $500.

A "trash pull"[4] at Mr. Scull's residence further supported the government's suspicions regarding a drug distribution conspiracy between the men. Items found in the trash included wrapping materials of the same size and quality used to package drugs, some of which contained residue which was later shown to include traces of crack cocaine. Agents also found baking soda, an ingredient commonly used to produce crack cocaine. In a subsequent search of Mr. Scull's residence, recently manufactured crack cocaine was found drying in a spare bedroom of the home, confirming the government's belief that cocaine was being produced there.

Additional drug sales further revealed the joint sale efforts between Mr.

---

[4]"A 'trash pull' is when officers attempt to inspect the contents of a target's trash for evidence of criminal activity." *United States v. Holmes*, 175 F.Supp.2d 62, 66 n.1 (D. Me. 2001). *See also California v. Greenwood*, 406 U.S. 38, 37 (1988) (garbage left out for collection not subject to Fourth Amendment protection).

Bono, Mr. Achon and Mr. Scull. Agent Shields testified he contacted Mr. Bono, indicating he was interested in buying more cocaine. Mr. Bono told the agent "he would get ahold of his guy, Daniel, and that Daniel would meet with [the agent] later that afternoon." Rec., vol. V at 182. At the arranged time and place, Mr. Achon arrived driving Mr. Scull's car, and sold Agent Shields fifty rocks of crack cocaine for $500. After the deal was completed, agents followed Mr. Achon back to Mr. Scull's house. On numerous other occasions, agents observed Mr. Bono and Mr. Achon departing from and returning to Mr. Scull's home in connection with their drug sales to Agent Shields.

Viewing the record under the totality of the circumstances, *Lacey*, 86 F.3d at 964, it is apparent the extended investigation enabled the government to identify additional members in Mr. Bono's drug conspiracy and confirm where they were manufacturing their drugs. The government's continued investigation of Mr. Bono did not constitute outrageous conduct.

## C. Alleged Jury Taint

Mr. Bono contends he was denied his Sixth Amendment right to a fair jury trial as a result of the district court's handling of his allegation of juror taint and prejudice. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial, by an impartial jury." U.S. CONST. amend. VI. Where a "juror's views would prevent or substantially impair

the performance of his duties as a juror in accordance with his instructions and his oath," he should be dismissed for cause. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quotations omitted). The district court has "broad discretion in determining how to handle allegations of juror bias." *United States v. Bornfield*, 145 F.3d 1123, 1132 (10th Cir. 1998). We therefore review the court's rulings in this regard under an abuse of discretion standard. *Id. See also United States v. Youts*, 229 F.3d 1312, 1320 (10th Cir. 2000).

On the second morning of Mr. Bono's trial, Mr. Stapp, an alternate member of the jury, reported to the court his belief that he had observed Mr. Bono's counsel, Mr. Kennedy, speaking with Ms. Deutsch, another jury member. Mr. Bono alleges that Mr. Stapp's perceived observation made him biased against Mr. Bono and his counsel, and that the district court abused its discretion in allowing Mr. Stapp to remain on the jury.

When the district court learned of Mr. Stapp's allegation, it separately questioned Ms. Deutsch and Mr. Stapp and allowed the lawyers for all parties to do the same. The court informed Ms. Deutsch someone had reported seeing her speaking to Mr. Kennedy and asked if she had any sort of conversation with him prior to entering the courthouse. Ms. Deutsch denied ever speaking to him. In questioning Ms. Deutsch, Mr. Kennedy asked if they had ever spoken to one another, and she answered no. When Mr. Stapp was separately questioned by the

court, he stated that as he was approaching the courthouse that morning, he thought he saw someone similar to Ms. Deutsch speaking to Mr. Kennedy. Mr. Stapp did not discuss this information with his fellow jury members. Mr. Kennedy informed the court that as he approached the courthouse that morning, he had walked in with Mr. Bono's wife, during which time they had a conversation. Upon dismissing Mr. Stapp back to the jury room, the court concluded his allegation was a case of mistaken identity.

Mr. Kennedy objected to Mr. Stapp's continued presence on the jury, arguing that "he can't be fair. . . . [A]t this point, he's compromised." Rec., vol. V at 217. The court decided it would not dismiss Mr. Stapp because he was the second alternate juror and was likely to be excused from the jury's deliberations. The court did re-instruct the jury to avoid contact with the lawyers and the parties and not to discuss the evidence until the end of the case. The court mentioned to the jury that an allegation of attorney/juror contact had been raised in order to "see if anybody [had a] negative reaction to this." Rec., vol. V at 219. No negative reactions were noted, and the trial proceeded. Upon the conclusion of the case and before the jury began its deliberations, Mr. Stapp was excused.

The record contains no evidence that Mr. Stapp was biased against Mr. Bono or his attorney, or that Mr. Stapp negatively influenced any other juror. Even if Mr. Stapp held some bias against Mr. Bono, his presence on the jury until

-14-

the end of the trial constituted harmless error because he did not participate in the jury's deliberations. *See United States v. Ashby*, 864 F.2d 690, 694-95 (10th Cir. 1988) (defendant's Sixth Amendment right to impartial jury not violated when, after four minutes of deliberation, court removed juror who previously expressed opinion regarding case to another lawyer, court added an alternate juror in his place, court questioned entire jury as to whether any jurors felt compromised by removed juror's statements, and court then restarted deliberations). We hold the district court acted within its discretion in deciding not to excuse Mr. Stapp from the jury. *See Bornfield*, 145 F.3d at 1132-33 (decision whether to remove juror is matter of discretion).

Mr. Bono also alleges the district court erred by not holding a hearing to determine the extent of any jury taint created by the court's statement to the jury that there was a report of attorney/juror contact, because the court failed to inform the jury the report was inaccurate. He asserts the court's statements exposed the jury to extraneous information which created prejudice against him. He also argues the court erred when it did not inform Ms. Deutsch the accusation was unfounded or question her as to whether the report of attorney/juror contact made her biased against Mr. Bono. He maintains that failing to inform Ms. Deutsch the accusation was false could have caused her to conclude the court believed Mr. Stapp's accusations, and hence made her biased against Mr. Bono. Mr. Bono

-15-

contends the court's failure to immediately disqualify Ms. Deutsch from the jury,

or hold a hearing to determine whether she was biased, was erroneous. He

requests us to order a new trial or remand this case for a determination regarding

the extent of any jury bias.

When members of a jury are exposed to extraneous information about a

matter pending before the jury, a presumption of prejudice arises. *Remmer v.*

*United States*, 347 U.S. 227, 229 (1954); *Mayhue v. St. Francis Hospital of*

*Wichita, Inc.*, 969 F.2d 919, 922-23 (10th Cir. 1992); *United States v. Hornung*,

848 F.2d 1040, 1044 (10th Cir. 1988).[5] "When a trial court is apprised of the fact

---

[5]We note that this circuit and others have questioned the appropriate breadth of *Remmer*'s presumption of prejudice rule, postulating the standard should be significantly narrowed, or replaced altogether. *See United States v. Greer*, 620 F.2d 1383, 1385 n.1 (10th Cir. 1980) (noting Federal Rule of Evidence 606(b) may require courts to narrow *Remmer*'s definition of presumption of prejudice). *See also Parker v. Head*, 244 F.3d 831, 839 n.6 (11th Cir.), *reh'g and suggestion for reh'g en banc denied*, 260 F.3d (11th Cir.), *cert. denied*, 122 S.Ct. 627 (2001) (noting split in circuits regarding whether *Remmer*'s presumption of prejudice rule still applies); *United States v. Sylvester*, 143 F.3d 923, 933-34 (5th Cir. 1998) (arguing *Remmer* standard was reconfigured by *Smith v. Phillips*, 455 U.S. 209 (1982), and *United States v. Olano*, 507 U.S. 725 (1995), under which presumption of prejudice is no longer automatic but rather determined at discretion of trial court); *United States v. Williams-Davis*, 90 F.3d 490, 495-97 (D.C. Cir. 1996) (arguing narrowing of *Remmer* standard has diminished presumption of prejudice and placed more discretion with trial court to determine if jury exposure to extraneous information was prejudicial); *State v. Mann*, 39 P.3d 124, 135 (N.M. 2002) (noting Supreme Court's possible narrowing of *Remmer*, and circuit courts' determinations of the same). In the absence of Supreme Court authority to the contrary, however, we review Mr. Bono's claim under *Remmer*'s rubric.

that an extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant." *Hornung*, 848 F.2d at 1045. The presumption of prejudice weighs heavily in favor of the defendant, but is not insurmountable. Thus, the government can seek to prove the exposure to extraneous information was harmless beyond a reasonable doubt. *United States v. Davis*, 60 F.3d 1479, 1485 (10th Cir. 1995). This Court has noted the "most common means of demonstrating the harmlessness of an extraneous contact is to show the existence of overwhelming evidence of [the] defendant's guilt." *Id.* (quotations omitted) (alteration in original).

Pursuant to *Remmer*, we normally review for abuse of discretion the district court's decision to hold a hearing and its determination whether any jury taint requires a new trial. *Id.* at 1482. Because Mr. Bono raised this objection for the first time on appeal, however, we review only for plain error. *Hughes*, 191 F.3d at 1322.

Even if the district court erred by failing to take the steps Mr. Bono alleges were required to ensure the jury was not biased against him, we are not persuaded under a plain error analysis that Mr. Bono can show this asserted error affected his substantial rights or seriously affected the "fairness, integrity, or public reputation of judicial proceedings." *Id.* "We give the trial judge wide latitude

with respect [to allegations of prejudice] because [the judge] was uniquely able to assess the likelihood that the extraneous information was prejudicial." *Mayhue*, 969 F.2d at 922. Here, the court investigated the initial report of attorney/juror contact and concluded it was unfounded. In an effort to determine if the allegation tainted the jury, the district court informed the jury of the report of attorney/juror contact, instructed them not to engage in contact with any of the lawyers, parties, or witnesses to the case, and gauged the jury for any negative reactions to the report. The record does not reflect that the court's statements negatively impacted the jury. Likewise, Mr. Kennedy did not object to the court's statements, request a further hearing to determine if the jury had been prejudiced, or ask that Ms. Deutsch be removed from the jury.

In addition, overwhelming evidence exists regarding Mr. Bono's guilt. *See Davis*, 60 F.3d at 1485 (overwhelming evidence of defendant's guilt supports conclusion of harmlessness). Mr. Bono sold crack cocaine to Agent Shields on two occasions, helped orchestrate four other similar drug sales to Agent Shields, and acted in concert with Mr. Scull and Mr. Achon to further their drug conspiracy. The lack of any evidence that the jury was tainted by the court's statements regarding the alleged attorney/juror contact, coupled with evidence of Mr. Bono's guilt, support our conclusion that the district court did not plainly err by not holding a hearing or taking further steps to determine the existence of jury

bias against Mr. Bono.

D. Sentence Enhancement for Prior Conviction

Finally, Mr. Bono argues the district court erred in failing to require the government to prove to the jury the fact of Mr. Bono's prior convictions as support for enhancing his sentence. We review *de novo*, *United States v. Martinez-Villalva*, 232 F.3d 1329, 1332 (10th Cir. 2000), and determine Mr. Bono's assertion has no support in the law.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that "*[o]ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 460 (emphasis added). Similarly, in *Martinez-Villalva*, this Court noted *Apprendi* "is not applicable when the sentence-enhancing fact is a prior conviction." *Martinez-Villalva*, 232 F.3d at 1331. *See also United States v. Dorris*, 236 F.3d 582, 587-88 (10th Cir. 2000) (*Apprendi* carves out exception for previous convictions). Therefore, the district court was not required to submit to the jury the issue of Mr. Bono's prior convictions in order to enhance his sentence.

## II

Mr. Scull was convicted of conspiracy to possess crack cocaine with intent to distribute, distribution of crack cocaine, possession of crack cocaine with

intent to distribute, maintaining a house for the manufacture of crack cocaine, and aiding and abetting the same. *See* 18 U.S.C. § 2, 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(B), § 846, §§ 865(a)(1), (b). Although Mr. Scull concedes the government presented direct evidence to support his conviction for distribution of crack cocaine, he contends the government failed to present sufficient evidence to convict him of the other charges. We are not persuaded.

In determining whether the government presented sufficient evidence to support the jury's verdict, "this court must review the record de novo and ask only whether, taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find [Defendant] guilty beyond a reasonable doubt." *United States v. Jenkins*, 175 F.3d 1208, 1215 (10th Cir. 1999) (quotations and citations omitted) (alteration in original). "Rather than examining the evidence in bits and pieces, we evaluate the sufficiency of the evidence by consider[ing] the collective inferences to be drawn from the evidence as a whole." *United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997) (quotations omitted) (alteration in original). Moreover, "while the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Johnson*, 42 F.3d 1312, 1319 (10th

Cir. 1994) (quotations and citations omitted).

The government provided sufficient evidence from which a jury could have reasonably found Mr. Scull was guilty of participating in a drug distribution conspiracy with Mr. Bono and Mr. Achon. "To prove a conspiracy in violation of 21 U.S.C. § 846, the evidence must establish: '(1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators.'" *United States v. Heckard*, 238 F.3d 1222, 1229 (10th Cir. 2001) (quoting *United States v. Carter,* 130 F.3d 1432, 1439 (10th Cir.1997)).

In finding a defendant guilty of conspiracy, a jury can "infer an agreement constituting a conspiracy 'from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose.'" *Carter*, 130 F.3d at 1439 (quoting *Johnson*, 42 F.3d at 1319). The jury is also permitted to presume "a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy." *Johnson*, 42 F.3d at 1319 (quotations omitted). Based on our review of the record, and drawing all reasonable inferences therefrom in favor of the government, we conclude sufficient evidence existed for a jury to find Mr. Scull conspired with Mr. Bono and Mr. Achon to possess crack cocaine with the intent

to distribute.

A reasonable inference of the parties' agreement to enter into a conspiracy can be drawn from the acts of the three men, coupled with other circumstantial evidence. When Mr. Bono first met with Agent Shields, he indicated he had a partner named Oscar. During a subsequent sale, Mr. Bono introduced Mr. Scull to Agent Shields as his partner, and Mr. Scull sold drugs to the agent. Evidence also showed Mr. Bono and Mr. Achon often stopped by Mr. Scull's residence prior to selling drugs to Agent Shields, and returned to Mr. Scull's home afterwards. At least two of the drug transactions with Agent Shields occurred in Mr. Scull's car.

Likewise, Mr. Scull's sale of drugs to Agent Shields, along with evidence from the trash pull indicating he was manufacturing crack cocaine in his home, support the finding that Mr. Scull knowingly and voluntarily participated in the conspiracy. The subsequent search of Mr. Scull's home further supports this conclusion. Agents found $32,000 worth of crack cocaine in the closet of a spare bedroom of Mr. Scull's residence. Some of the crack cocaine was recently manufactured and still drying, while other amounts were packaged in a manner similar to that received by Agent Shields during his deals with Mr. Bono, Mr. Scull and Mr. Achon. The agents also found assorted papers in the room, some of which contained phone numbers of members of the conspiracy while others

appeared to contain records of drug sales. In the bedroom closet with the drugs, agents found a jacket matching Mr. Scull's size and containing $2000.[6] Agents found another $1000 in Mr. Scull's bedroom. The money was in denominations consistent with drug trafficking. The house also contained two microwaves, which could have been used to manufacture crack cocaine.

The interdependence between Mr. Scull, Mr. Bono and Mr. Achon is demonstrated by the evidence. As already noted, Mr. Bono mentioned he had a partner, and introduced Mr. Scull as such. Mr. Bono also mentioned to Agent Shields that he and his partners made their own crack cocaine. Once, when Agent Shields contacted Mr. Bono to set up a drug sale, Mr. Bono stated he was taking a break from selling drugs. He said his partner was out of town so he did not have any drugs to sell. When Agent Shields recontacted Mr. Bono about whether he was selling again, Mr. Bono answered affirmatively but said he needed a bit more time. Prior to selling another batch of crack cocaine to Agent Shields, Mr. Bono was seen at Mr. Scull's residence. Additionally, Mr. Bono and Mr. Achon stopped by Mr. Scull's home before and after drug sales and sometimes used his

---

[6]Mr. Scull attempts to argue there was insufficient evidence to connect him to drugs found in the bedroom, alleging Mr. Achon was staying there. While random papers belonging to Mr. Achon were found in the room, other materials and clothing found there could not be connected to Mr. Achon. Mr. Achon's papers also indicated he did not have the same address as Mr. Scull. Moreover, Mr. Scull did not present any evidence that he did not have access to the room.

car for drug transactions.

Finally, the government's evidence is sufficient to show Mr. Scull had knowledge of the essential objectives of the conspiracy. He participated in drug sales and manufactured crack cocaine in his home to support the sales efforts of Mr. Bono and Mr. Achon. When it appeared Mr. Bono suspected Agent Shields might be an undercover officer and called him to his auto shop to further question him, Mr. Scull was also seen at the shop. Agents watching the shop observed Mr. Scull looking into cars parked outside the business "as if he was looking to see if there was some type of law enforcement surveillance" in the area. Rec., vol. V at 435. A jury could have reasonably concluded Mr. Scull believed the drug conspiracy of which he was a member was in jeopardy, and was therefore searching to ensure he and his cohorts were not being watched by the police. *See Carter*, 130 F.3d at 1440 (inference of defendant's knowledge and participation in conspiracy supported by defendant's attempts to evade police officers when he was with co-defendant previously found with drugs). Therefore, a jury could reasonably have found the evidence proved Mr. Bono, Mr. Scull and Mr. Achon conspired together to sell crack cocaine.

Sufficient evidence also supports Mr. Scull's conviction for possession of crack cocaine with intent to distribute. The basis of this charge rested on the government's discovery of crack cocaine in the spare bedroom of Mr. Scull's

home. In order to prove this charge, the government was required to show Mr. Scull possessed the drug, knew he possessed the drug, and intended to distribute the drug. *See id.*; *Wilson*, 107 F.3d at 778. As with his attempt to undermine his conspiracy conviction, Mr. Scull alleges Mr. Achon was staying in the bedroom where the drugs were found and the government therefore could not prove he had possession over those drugs. Because the drugs were not in Mr. Scull's actual possession, we analyze whether Mr. Scull had constructive possession over them.

"Constructive possession occurs when a person 'knowingly has ownership, dominion or control over the narcotics and the premises where the narcotics are found.'" *Jenkins*, 175 F.3d at 1216 (quoting *Wilson*, 107 F.3d at 778). "In cases involving joint occupancy of a place where contraband is found, mere control or dominion over the place in which the contraband is found is not enough to establish constructive possession." *United States v. McKissick*, 204 F.3d 1282, 1291 (10th Cir. 2000). Rather, "the government is required to present 'direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband." *Id.* (quoting *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998)). The government has satisfied these standards.

Mr. Scull clearly had control and dominion over the place where the drugs were found. It was his home, and when agents executed the search warrant for

his residence, the only people at the house were Mr. Scull, his wife, and children. Even if we were to believe Mr. Scull's assertion that he did not have exclusive control over the bedroom in which the drugs were found, the government presented sufficient evidence to establish a nexus between Mr. Scull and the drugs. As noted previously, very few personal items were found in the bedroom, nor was there evidence someone regularly stayed there, much less that Mr. Achon was the only one who inhabited the room. Moreover, the jacket found in the bedroom closet was Mr. Scull's size indicating Mr. Scull, who was considerably larger than Mr. Achon, had access to the room. This evidence, coupled with the materials pulled from Mr. Scull's trash indicating crack cocaine was being manufactured in his home, and Mr. Scull's drug sale to Agent Shields, establishes a sufficient nexus between Mr. Scull and the drugs. *See Jenkins*, 175 F.3d at 1215-17 (defendant had constructive possession over drugs found in codefendant's residence and backyard where defendant regularly spent the night and sold drugs from house, and cocaine base and $3000 were found there).

Mr. Scull also contends the government failed to prove he maintained a place for manufacturing and distributing cocaine. In order to convict a defendant of this charge, the prosecution must "prove that [the defendant] (1) knowingly (2) opened or maintained a place (3) for the purpose of manufacturing a controlled substance." *United States v. Higgins*, 282 F.3d 1261, 1276 (10th Cir. 2002).

Based on the evidence already cited in this opinion, Mr. Scull's claim fails. Evidence obtained from the trash pulled from Mr. Scull's home indicated drugs were being manufactured there. Drying and packaged crack cocaine were found in Mr. Scull's home. Mr. Scull's co-conspirators were seen coming to and from his home in the course of completing drug sales. Taking the evidence with all the reasonable inferences to be drawn therefrom most favorably to the government, the evidence was sufficient to warrant Mr. Scull's guilty verdict for maintaining a place for the manufacture and distribution of drugs.

We **AFFIRM** the convictions of both Mr. Bono and Mr. Scull.