**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**February 13, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LUIS ALFREDO JACOBO, a/k/a
Lokz,

    Defendant - Appellant.

No. 23-5114
(D.C. No. 4:21-CR-00102-GKF-6)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT\***

_____

Before **HARTZ**, **PHILLIPS**, and **FEDERICO**, Circuit Judges.

_____

Defendant-Appellant Luis Alfredo Jacobo ran a methamphetamine

(meth) distribution ring that trafficked drugs from California to Oklahoma

and Missouri. In 2021, Jacobo was tried before a jury and convicted of one

count of directing a continuing criminal enterprise (CCE) in violation of

21 U.S.C. § 848(a)–(d), three counts of drug conspiracy in violation of

---

\* This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be
cited, however, for its persuasive value consistent with Federal Rule of
Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

21 U.S.C. §§ 846 and 841(b)(1)(A)(viii), and twenty-one counts of unlawful use of a communication facility under 21 U.S.C. §§ 843(b) and 843(d)(1). He was sentenced to life imprisonment.

On appeal, we must decide whether the bulk of Jacobo's convictions and sentences should be overturned. Jacobo argues that the Government presented insufficient evidence to prove that he supervised enough people to qualify as running a CCE. He also argues that his sentences for drug conspiracy and unlawful use of a communication facility violate double jeopardy.

Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we affirm in part and reverse and remand in part.

## I.    FACTS AND PROCEDURAL HISTORY

### A.    Factual Background

For many years, Jacobo ran an extensive drug trafficking network. Out of his home in Bakersfield, California, Jacobo distributed large amounts of meth worth millions of dollars. What made this drug trafficking network so extensive is that it involved many different people, transactions, and locations. We next endeavor to summarize the network, as it is relevant to the resolution of this appeal.

From 2016 to 2018, Jacobo distributed meth in his local area. One of the people he sold meth to was Symantha Handy, who both used and

2

distributed that meth. Handy was introduced to Jacobo in 2016 by her former dealer. After they met and Jacobo agreed to sell her meth, Jacobo used runners to regularly deliver the meth to Handy. Handy would then sell most of the meth and use the money to pay back Jacobo (a transaction known as "fronting"), either in person or through another runner. Among the runners were an unidentified man named Junior and another man who claimed to be Jacobo's brother. Jacobo would also text Handy regularly and tell her to pick up meth from men at various homes.

Over time, Handy worked with Jacobo to recruit more people into his meth distribution network. Handy introduced Jacobo to Adam Paquette, who joined the operation. Jacobo gave meth to Paquette both personally and through runners, which Paquette then distributed further. One of these runners was a man by the name of Tony Garcia. Jacobo often told Paquette to go to Garcia's house to pick up meth.

In 2018, Handy moved to Oklahoma. As she was about to move, Jacobo directly gave her a half pound of meth, which she sold once she arrived in Oklahoma. Jacobo then began sending her meth by mail, several pounds at a time. In return, Handy would send cash transfers to various addresses at Jacobo's request.

Eventually, Jacobo was distributing meth to northeast Oklahoma and southwest Missouri through a network of drivers and dealers, most of whom

3

had moved to that area from Bakersfield. By the middle of 2019, Jacobo was sending 50-to-75 pounds of meth from California by car and truck for distribution in Oklahoma and Missouri. This soon grew to regular 100-to-200-pound shipments that were exchanged for hundreds of thousands of dollars.

Handy helped Jacobo build this network by bringing in various other dealers in Oklahoma: Cary Grace, Charles Grace, and Mitsy Jones. Jacobo encouraged Handy to work with these people to "push more" meth. R. Vol. I at 558–59. Handy also connected Jacobo with two dealers in Missouri, Billy Johnson and Jerry Thornton, who then became a key part of the operation.

Soon after they started working together, Jones and Handy had a falling out because Jones started communicating directly with Jacobo. Handy became upset with Jacobo and briefly stopped sending him money from her meth sales. In response, Jacobo encouraged Handy via text message to "start working again" with Jones and "leave old issues in the past[.]" R. Supp. at 11. He also communicated with her by text that he knew where she lived and would "get my money one way or another[.]" *Id.* at 12. He then sent Johnson to Handy's house to collect money from her.

Jacobo continued to work with Jones during this time. Jacobo would send her meth by mail for her to resell, and the two would regularly

4

communicate by text to coordinate packages and payments. During this time, Jones referred to Jacobo in text messages as "Boss." *Id.* at 29, 34-35.

Johnson enlisted others to help him receive and distribute meth from Jacobo. Among them was Josh Davenport, who supplied cars for delivery, received and stored shipments of meth, and drove cash back to Jacobo. Another was Gene Rast, who would regularly drive cash to Jacobo in Bakersfield, and then receive meth to take back to Oklahoma and Missouri. When he arrived in Bakersfield, Rast would meet with Tony Garcia to swap meth and cash. On one occasion, Rast got into a traffic accident in Bakersfield. Afterwards, he met with Jacobo, who arranged for a tow truck to take the wrecked vehicle and then provided a new pickup truck to Rast.

Other associates of Johnson included Kelly Bryan, Adam Roberts, and Johnson's girlfriend, Shauni Callagy, all of whom helped Johnson receive and deliver meth. Finally, Johnson relied on help from his longtime friend, Jesus Martinez. Martinez also made regular car trips to Bakersfield to exchange cash for meth. He spoke to both Johnson and Jacobo to coordinate these deliveries. Martinez also involved his girlfriend, Renee Haynes, in dealing meth. After Martinez was arrested in 2021, Jacobo reached out to Haynes to ask her to take over Martinez's duties. Haynes began driving back and forth to Bakersfield, picking up meth in person from Jacobo and Garcia.

In 2021, agents from the U.S. Drug Enforcement Administration (DEA) tried to arrest Jacobo at his home in Bakersfield, but he fled. Later that day, he surrendered voluntarily to the police.

## B.    Procedural History

Jacobo was indicted by a grand jury in the Northern District of Oklahoma on thirty charges. Count One was a charge of engaging in a CCE under 21 U.S.C. §§ 848(a)–(d).[1] Counts Two through Four were charges of a drug conspiracy under 21 U.S.C. §§ 846 and 841(b)(1)(A)(viii).[2] Jacobo's coconspirators included Billy Johnson, Shauni Callagy, Gene Rast, Jesus Martinez, Renee Haynes, Tony Garcia, and Kelly Bryan. Symantha Haynes and Mitsy Jones were unindicted coconspirators. Jacobo's remaining twenty-six counts were for unlawful use of a communication facility (commonly known as a "phone count") under 21 U.S.C. §§ 843(b) and 843(d)(1).

---

[1] Several other defendants were charged in the same indictment – Counts Five through Thirteen – with drug conspiracy and possession of meth with intent to distribute in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(viii), (b)(1)(B)(viii), (b)(1)(C), maintaining drug-involved premises in violation of 21 U.S.C. § 856(a)(1) and (b), interstate and foreign travel or transportation in aid of racketeering enterprises in violation of 18 U.S.C. § 1952(a)(3), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).

[2] Count Two was a conspiracy centered around Handy, Count Three for Jones, and Count Four for Johnson.

The Government presented thirty-four witnesses who testified at trial. At the close of the Government's case, Jacobo moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. The district court denied the motion for most of the counts, but reserved ruling on Count One (CCE) and Counts Thirty-one and Thirty-three (phone counts). The district court later denied the motion as to all three of these counts in a written order.[3]

At the conclusion of a six-day jury trial, on November 7, 2022, the jury found Jacobo guilty on all counts except for five of the twenty-six phone counts. On October 20, 2023, the district court sentenced Jacobo to life in prison for Counts One through Four and forty-eight months imprisonment for each of the twenty-one phone counts of conviction, running concurrently. Jacobo timely appealed, raising two issues – sufficiency of the evidence and double jeopardy.

---

[3] Although the district court requested briefing on the Rule 29 motion for acquittal regarding CCE, neither Jacobo's trial counsel nor the Government filed a brief. The jury found Jacobo was not guilty of Counts Thirty-One and Thirty-three, so the Rule 29 motion was denied as moot as to those two counts.

## II.    DISCUSSION

### A.    Evidence Sufficiency: CCE Conviction

On appeal, Jacobo first argues the Government failed to present sufficient evidence to convict him of a CCE. Because of the punitive exposure it had on Jacobo and his sentence, it was the most serious charge he faced at trial.

By law, CCE requires a defendant to engage in a continuing series of criminal violations "which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management[.]" 21 U.S.C. § 848(c)(2)(A). Under the instructions given to the jury "[t]he term 'organizer, supervisor, or manager' means that the defendant was more than a fellow worker, and that the defendant either organized or directed the activities of five or more other persons, exercising some form of managerial authority over them. The defendant need not be the only organizer or supervisor." R. I at 398; *see also* 10th Cir. Crim. Pattern Jury Instructions No. 2.88 (2023).

We have previously said "that the concepts of organize, supervise and manage must be given their 'everyday meanings.'" *United States v. Smith*, 24 F.3d 1230, 1233 (10th Cir. 1994) (quoting *United States v. Dickey*,

736 F.2d 571, 587 (10th Cir. 1984)). Jacobo argues that the Government failed to provide sufficient evidence of this element of CCE.[4]

"In determining whether the government presented sufficient evidence to support the jury's verdict, this court must review the record de novo[.]" *United States v. Gregory*, 54 F.4th 1183, 1192 (10th Cir. 2022) (quoting *United States v. Scull*, 321 F.3d 1270, 1282 (10th Cir. 2003)). We then see "whether, taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find [the] Defendant guilty beyond a reasonable doubt." *Id.*

Jacobo concedes that three individuals, Renee Haynes, Jesus Martinez, and Tony Garcia, worked under his supervision or management. Jacobo argues that the Government failed to establish that he managed two more individuals, which was needed to meet the law's requirement of "five or more other persons." 21 U.S.C. § 848(c)(2)(A). We disagree.

At the very least, there was sufficient evidence for a reasonable jury to conclude that Jacobo organized, supervised, or managed Handy and Jones. Jacobo contends that his role in supplying Handy and Jones was akin

---

[4] This was the only challenge to the CCE conviction raised in Jacobo's Rule 29 motion, so any other challenge to the sufficiency of the evidence was forfeited. *See United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007).

to that of a wholesaler, selling meth for lower distributors to use or distribute as they saw fit. He is correct that "proof of a buyer-seller relationship alone is not enough to establish a managerial role[.]" *United States v. McDermott*, 64 F.3d 1448, 1457 (10th Cir. 1995). However, "additional evidence of formal or informal authority or responsibility respecting a purchaser's conduct may suffice." *Id*. Evidence of such authority exists for both Handy and Jones.

When Jacobo communicated with Handy, he would set the terms of where she would pick up meth and how she would send cash back to him. Even though Handy exercised discretion over whom she sold meth to and the price she sold it at, Jacobo managed her activities in other ways. Text messages from Jacobo show that he directed her to talk to other distributors so "we can push more." R. Supp. at 3. Handy also testified that Jacobo tried to get her to recruit others to be "on the team." R. I at 596. When Handy failed to send Jacobo money because of her feud with Jones, Jacobo threatened her and sent Johnson to ensure she complied with his instructions. At the same time, Jacobo tried to get Handy to reconcile with Jones so that the two would start working together again. These actions, especially taken in context, indicate a degree of management and authority over Handy.

10

Likewise, Jacobo directed terms and actions to Jones and told her how to communicate with him and send money back to him after he gave her meth. Jones also testified that she looked for new people to sell meth to both on her own and at Jacobo's encouragement. The evidence presented at trial showed that all of Jones's activities ran upstream back to Jacobo. Indeed, Jones even called Jacobo "Boss." R. Supp. at 29, 34-35. At the very least, this shows Jacobo exercised "informal authority or responsibility respecting" her conduct. *McDermott*, 64 F.3d at 1457. Taking this evidence in the light most favorable to the Government, a reasonable jury could have inferred that Jacobo exercised managerial control over both Handy and Jones.

Given that Handy and Jones bring the total number of supervised individuals up to five, we could stop our review at this point. However, for completeness, we also find that even if Handy and Jones were not sufficient (they are), Jacobo's sprawling drug distribution network included several additional people that a reasonable jury might conclude that he managed or supervised. The relationships among the various meth distributors were fluid, but "[t]he managerial relationship requirement [for CCE] is flexible." *United States v. McSwain*, 197 F.3d 472, 478 (10th Cir. 1999).

A reasonable jury also could have concluded that Jacobo managed Johnson, who organized significant meth distribution in Oklahoma and

11

Missouri. Even though Johnson clearly exercised some autonomy and his own authority, a "co-manager" can be "included as one of the five others with respect to whom the defendant holds a supervisory position." *United States v. Almaraz*, 306 F.3d 1031, 1040 (10th Cir. 2002) (citing *McSwain*, 197 F.3d at 479–80). Jacobo told Johnson where his drivers should pick up meth, organized the transactions, and paid for Rast's car when he got into an accident while driving for Johnson. Handy also testified that Jacobo "sent [Johnson] to my house to collect on a shipment that Jacobo sent me."

Several people appeared to have worked as drivers at the direction of Johnson, including Josh Davenport, Gene Rast, Shauni Callagy, Kelly Bryan, and Adam Roberts. They could also be considered to have been managed by Jacobo because "a defendant may not insulate himself from liability by delegating authority," and thus "need not have had personal contact with each of the five persons involved[.]" *McSwain*, 197 F.3d at 479–80 (internal quotation marks omitted).

Regardless, Rast did have personal contact with Jacobo, who arranged for him to have a new truck to transport meth and cash, which strongly indicates a managerial relationship. A jury could also have reasonably inferred the existence of several unnamed runners in Bakersfield working for Jacobo, such as "Junior" and the man who identified himself to Handy as Jacobo's brother.

Even though Jacobo may not have controlled every facet of how his dealers and their sub-dealers distributed meth, he still "arrange[d] a number of people engaged in separate activities into an essentially orderly operation." *Smith*, 24 F.3d at 1233 (10th Cir. 1994) (citing *United States v. Apodaca,* 843 F.2d 421, 426 (10th Cir. 1988)). Given the size, scale, and breadth of Jacobo's drug organization, a reasonable jury could have considered the Government's evidence and concluded that he managed, supervised, or organized at least five people.

### B.   Double Jeopardy: CCE and Conspiracy

For the first time on appeal, Jacobo argues that the district court erred in convicting and sentencing him on both the CCE and the drug conspiracy offenses because it results in multiplicitous sentences that violate the Double Jeopardy Clause. In addition to the concurrent life sentences for Counts One through Four, the district court also ordered a $100 special assessment for each count of conviction, totaling $2,500 in assessments for the twenty-five counts of conviction. Jacobo's double jeopardy argument pertains to both the prison sentences and special assessments for these counts.[5]

---

[5] Jacobo does not otherwise challenge the sentence for the CCE count in this appeal. He instead argued that he "should only have had one life sentence and one [special assessment of $100] imposed." Op. Br. at 12.

13

Because Jacobo did not raise this argument before the district court, we review it for plain error. *See United States v. Frierson*, 698 F.3d 1267, 1269 (10th Cir. 2012). "Under the plain error standard, [a defendant] must show clear or obvious error that affected his substantial rights and seriously affected the integrity of the judicial proceedings." *Id.* (alteration in original) (quoting *United States v. Battle*, 289 F.3d 661, 669 (10th Cir. 2002)). "For an error to be plain, it must be an error that is clear or obvious under current, well-settled law." *United States v. Miller*, 978 F.3d 746, 763 (10th Cir. 2020) (citation and internal quotation marks omitted). This typically requires on-point precedent from either the Supreme Court or the Tenth Circuit. *Id.* Because multiplicitous sentences violate double jeopardy, "if a defendant is convicted of both charges, the district court must vacate one of the convictions." *Frierson*, 698 F.3d at 1269 (citations omitted).

The Double Jeopardy Clause of the Fifth Amendment assures that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. In this context, there is a Supreme Court opinion directly on point that applies the Double Jeopardy Clause to these counts of conviction and operates as controlling precedent.

In *Rutledge v. United States*, the Supreme Court held that a drug conspiracy is a lesser included offense of a CCE offense. 517 U.S. 292, 307 (1996). As such, the two offenses merge, and any concurrent sentences must

14

be vacated. *Id.* The Government concedes that *Rutledge* governs here and that the district court plainly erred in sentencing Jacobo on Counts Two through Four. We agree, and therefore remand to the district court with instructions to vacate the concurrent sentences and special penalty assessments on the lesser included offenses of conspiracy in Counts Two through Four. *See United States v. Atencio*, 435 F.3d 1222, 1235 (10th Cir. 2006).

### C.     Double Jeopardy: CCE and Phone Counts

Jacobo likewise argues that his convictions and sentences for the phone counts impose double jeopardy. Unlike the conspiracy counts, the Government does not concede this point as to the phone counts and argues in opposition. Again, this issue was not raised in the district court, so we review for plain error. *Frierson*, 698 F.3d at 1269.

Under 21 U.S.C. § 843(b), it is "unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission" of a drug offense. *Id.* On the CCE section of the special verdict form, the jury found that the Government proved both drug conspiracy and unlawful use of a communication facility as predicate offenses for the jury's findings on the CCE charge.

Again, under *Rutledge*, lesser included offenses merge with greater offenses. 517 U.S. at 307. But *Rutledge* distinguished conspiracy-like

15

offenses from underlying substantive drug offenses when determining whether they merged with the CCE offense. *Id.* at 300 n.12. So, *Rutledge* does not dictate the outcome and relief that Jacobo seeks regarding the phone counts. Rather, the Supreme Court has recognized that it is still possible for there to be "separate punishments for the underlying substantive predicates and for the CCE offense." *Garrett v. United States*, 471 U.S. 773, 795 (1985).

Jacobo does not identify any precedent that the phone counts should merge with CCE. And assuming, *arguendo*, it is debatable whether these counts should be considered substantive predicates that can be charged in addition to CCE, or whether they should merge with CCE, the answer is not "clear or obvious under current, well-settled law." *Miller*, 978 F.3d at 763 (quoting *United States v. DeChristopher*, 695 F.3d 1082, 1091 (10th Cir. 2012)). In turn, the district court did not commit plain error in convicting and sentencing Jacobo on the twenty-one counts of unlawful use of a communication facility.

## III.   CONCLUSION

We **AFFIRM** the convictions and sentences by the district court on all counts, except for Counts Two through Four, where we **REVERSE** the conviction and **REMAND** with instructions to the district court to vacate

these convictions and sentences and conduct further proceedings consistent with this decision.

Entered for the Court

Richard E.N. Federico
Circuit Judge