**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**November 14, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

TROY A. GREGORY,

    Defendant - Appellant.

No. 20-3232

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:17-CR-20079-JAR-1)**

_____

Solomon L. Wisenberg, Nelson Mullins Riley & Scarborough LLP, Washington, D.C. (Beverly A. Pohl, Nelson Mullins Broad and Cassel, Fort Lauderdale, Florida, and Reed J. Hollander, Nelson Mullins Riley & Scarborough LLP, Raleigh, North Carolina, with him on the briefs), on behalf of the Appellant.

Francesco Valentini, Trial Attorney, U.S. Department of Justice, Criminal Division, Appellate Section, Washington, D.C. (Nicholas L. McQuaid, Acting Assistant Attorney General, and Daniel S. Kahn, Acting Deputy Assistant Attorney General, U.S. Department of Justice, with him on the brief), on behalf of the Appellee.

_____

Before **HARTZ**, **BACHARACH**, and **EID**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Defendant Troy A. Gregory, a former senior vice president of University National Bank (UNB) in Lawrence, Kansas, was charged with one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349, four counts of bank fraud in violation of 18 U.S.C. § 1344, and two counts of making false bank entries in violation of 18 U.S.C. § 1005. These charges arose from Defendant's arrangement of a $15.2 million loan by 26 banks to fund an apartment development by established clients of UNB.

The four bank-fraud counts, each corresponding to a specific "victim bank," alleged that to secure the banks' participation in funding the loan, Defendant knowingly made three material misrepresentations: (1) that the borrowers were financially strong; (2) that the apartment-complex land would be "free and clear" of debt by the time of the loan; and (3) that the borrowers had $1.705 million in two certificates of deposit (CDs) at UNB on April 11, 2008, to be pledged as collateral.[1] The two counts of making false bank entries were based on Defendant's listing two CDs as collateral, and creating corresponding security agreements, when no such CDs existed. After a ten-day trial, including two days of deliberations, a jury in the United States District Court for the District of Kansas found Defendant guilty on all counts except the conspiracy count, on which the jury could not reach a unanimous verdict. The court sentenced Defendant to 60 months in prison and three years of supervised release.

---

[1] A certificate of deposit (CD) certifies that a certain amount of money has been deposited in a bank to remain there for a certain period of time.

2

Defendant appeals the district court's denial of (1) his motion for a judgment of acquittal and (2) his motion for a new trial on the ground that the government's extended hypothetical in closing argument was not based on facts in evidence and constituted prosecutorial misconduct. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. Defendant's conviction was supported by sufficient evidence and the government's closing argument was rooted in evidence presented at trial or reasonable inferences drawn from that evidence.

## I.    BACKGROUND

Defendant was a longtime UNB employee and executive who served as the loan officer for dozens of loans to two limited liability companies, Big D Development and Big D Construction (collectively "Big D"), and their owners. Big D's owners included David Freeman (the largest owner) and two limited liability companies—Opportune and JMD. Opportune was owned by William Skepnek and Brennan Fagan. JMD was owned by John Duncan Jr.

In 2006, Big D developed two residential subdivisions (the "Sutter developments") in Junction City, Kansas, which comprised mostly single-family residences. Big D anticipated population growth in the area following the expansion of the nearby military base, Fort Riley. UNB financed the development, with Defendant acting as the loan officer; other banks also provided funds through a participation loan for which UNB was the originating bank. By including other banks, a participation loan allows a bank to lend some of the money for a project when the full amount would exceed the bank's legal lending limit—a cap imposed by

3

regulators on the amount that a bank can lend to an individual borrower based on the bank's capital—or would otherwise be considered uncomfortably large for the bank. In a participation loan the "originating" or "lead" bank (here, UNB) is typically the only bank to deal with the borrowers directly. The lead bank may deal directly with each of the participating banks or deal solely with a "correspondent" bank that handles matters with the participants. Bankers' Bank of Kansas (BBOK) served as the correspondent bank for the Sutter developments.

The Sutter-development units did not sell as expected. By June 2007, 242 of the 538 lots remained unsold; and little changed through the fall, leaving Big D with virtually no income. In addition, Big D was unable to secure much-needed funding from the state's Rural Housing Incentive District program, which provides certain payments to developers in qualifying areas. According to Big D owner Fagan, by late 2007 Big D was in a "[t]errible" financial position. R., Vol. IV at 818. It still owed UNB $1.9 million on the Sutter developments and was unable to keep up with payments on those and other debts to UNB. John Larkin, the owner of Larkin Excavating—which performed excavating work on the Sutter developments— testified that he was never timely paid for his work, with payments on invoices being 90, or even 120, days past due.

Individual Big D owners were struggling too. Duncan testified that he was having "cash flow issues" during this time and was unable to keep up with his debt at UNB. R., Vol. VII at 1693, 1700. By mid-2007 he owed more than $1.9 million on his own loans at UNB. He testified that he was unable to make any payments on the

4

loans and that he worked with Defendant to renew or extend past-due loans, often just for a short period; he did not recall ever discussing with Defendant during this time how a loan would be repaid by the due date. For example, he testified that he took out a $600,000 loan from UNB (for which Defendant was the loan officer) in March 2007 to pay down a $3.8 million loan from another bank. When the UNB loan came due in June 2007, he was unable to pay it back and had to renew the loan "[c]ountless times." R., Vol. VII at 1694. Fagan also testified that his personal financial position "wasn't good" in late 2007. R., Vol. IV at 819. Still, in November 2007, Defendant arranged for Fagan to incur further debt by taking out a $55,000 loan with UNB (for which Defendant was the loan officer) to help pay past-due interest on Big D loans. Just how bad the financial situation of the borrowers was will be described more fully in the discussion of the sufficiency of the evidence.

### A.    Origins of the Bluejay Loan

In an effort to end their financial distress, some of the Big D owners conceived of developing an apartment complex in Junction City—dubbed the Quinton Point Apartments. They believed that once Fort Riley expanded, there would be demand for rentals, particularly from military families. As Duncan put it, the Big D owners thought that this project was their "golden goose," the "end-all, be-all" solution to their financial problems. R., Vol. VII at 1712, 1731.

The Big D owners formed a new limited liability company for the Quinton Point venture, Bluejay Properties. By the beginning of 2008, Bluejay's owners included the above-mentioned Big D owners—Freeman, Skepnek, Fagan, and

Duncan—either individually or via entities controlled by them; and later they added Larkin, whose company was still owed $1 million for its excavation work on the Sutter developments. Big D would serve as the contractor on the Quinton Point project. The Big D owners hoped to make money as owners of Big D on the construction itself (the construction fees earned on the project would help pay down its debt) and as owners of Bluejay when they sold the complex.

Bluejay acquired some land, obtained an appraisal valuing the planned complex at $20.2 million, and received a letter of intent from a potential buyer, TIC Capital, LLC, to purchase the complex for $17.952 million upon completion. The estimated construction budget for the project was just under $14.4 million, and the Bluejay owners proposed borrowing that amount from UNB. Fagan testified that Defendant seemed "committed to making this loan happen." R., Vol. IV at 825.

To secure approval for loans over $250,000, Defendant had to submit a credit request to the bank's loan committee. If the committee approved the credit request, UNB's credit department would obtain the necessary paperwork and prepare the loan for closing. A $14.4 million loan far exceeded UNB's legal lending limit of just over $2 million per borrower and each of the individuals was heavily in debt—with Fagan and Duncan just below the lending limit. UNB would therefore need help from other banks to join in a participation loan.

### B.    UNB's Loan Statement and Approval

To initiate the approval process for the Bluejay loan, Michael Bartlow, a UNB vice president of credit administration, drafted a Loan Application/Purpose Statement

6

(Loan Statement) dated December 5, 2007. Bartlow's duties included preparing loan applications, occasional inspections of construction sites, and other tasks as needed by management. He testified that Defendant supplied the underlying information that Bartlow used to draft the Loan Statement and that Defendant reviewed and approved the document. In addition to listing basic terms and repayment sources (namely, sale of the apartment complex), the Loan Statement included each individual owner's total loan exposure at UNB, brief narrative summaries of the borrowers' financial statements, and an overview of the project budget. Defendant presented the information from the Loan Statement to a UNB committee on December 5, 2007. The committee approved the loan, "subject to . . . review and acceptance of the contract with TIC Capital [which had signed a letter of intent] to purchase the apartment complex after completion"; the loan was also approved by three members of the board of directors. R., Vol. IX at 2216. (The TIC contract was executed in April 2008, before the loan closed.)

Defendant then enlisted the help of BBOK as the correspondent bank with responsibility for soliciting and managing relationships with participant banks. This was a familiar role for BBOK. As a "banker's bank," its customers were other banks rather than the public, and it often sought and facilitated loans in which a number of smaller banks could participate. UNB was responsible for gathering the relevant information from its records and from the borrowers and providing that information to BBOK so potential participant banks could make informed decisions. UNB would

also manage the relationship with the borrowers, so the other banks would not communicate directly with them.

On December 10, 2007, Defendant sent the Loan Statement to Craig Ellis, a loan officer at BBOK, in an email that stated: "Please review and call me so we can go over everything." R., Vol. XIII at 3026.

### C.    BBOK's Offering Package to Participant Banks

Ellis did not testify at trial, but both UNB and BBOK employees testified that substantive communications regarding the loan would typically have been between Ellis and Defendant (although their assistants exchanged paperwork). Rhonda Scott, a UNB loan administrative officer who reported to Defendant, testified that Defendant was responsible for handling the communications and relationship with BBOK, where Ellis was the primary point of contact. And Jeannie Dailey, a former BBOK loan officer who helped Ellis analyze the proposed loan, testified that Ellis and Defendant had conversations about the loan and any questions she had about the loan would flow through Ellis to Defendant and back to her through Ellis; any relevant information about the borrowers would come from Defendant.

BBOK performed its own analysis of the materials obtained from UNB and submitted a proposed Offering Package for approval by its loan committee and board of directors, which is composed of owners of other banks. The Offering Package included a seven-page Loan Summary and Narrative drafted by BBOK, a copy of UNB's Loan Statement, the borrowers' financial statements, the construction budget,

an appraisal summary, a market study on similar apartment complexes in the area, and news articles about development in Junction City.

The BBOK board reviewed the proposal and approved it on January 25, 2008, subject to the condition that the borrowers put down 15% in equity or cash down payment. The loan amount also increased from $14.4 to $15.2 million. The Bluejay owners had initially hoped that they would need to provide only 10% cash or equity and asked Defendant if other banks would take on the loan for less than 15%. Fagan testified that the Bluejay owners knew it would be difficult to come up with the required 15% and that they explored alternative solutions. He said that at one point they discussed the possibility of a private lender pledging a letter of credit for $2 million on behalf of Bluejay; but "that was ultimately determined to be insufficient" because BBOK "wanted hard assets." R., Vol. IV at 827. Fagan "thought the deal was dead." *Id.*

On February 1, Ellis emailed Defendant a copy of what had been submitted to the BBOK board, with a cover note stating: "Troy– Our presentation as we discussed." R., Vol. XIII at 3054. On March 21, BBOK distributed to the participant banks a virtually identical Offering Package.

The March 21 Offering Package: (1) listed as collateral the apartment complex and "$1,400,000 in a certificate of deposit @ UNB pledged to the loan," R., Vol. XII at 2879; (2) said that the "Borrower's equity in this project is the land *which is owned free and clear*," *id.* at 2883 (emphasis added); and (3) provided financial information about Bluejay owners Freeman, Duncan, Skepnek, and Fagan, who were guarantors

9

on the loan (there was little information available about Bluejay itself, as it was a
new entity).

The financial information consisted of a brief statement and chart overview of
the owners' net worth and liquid assets. For more detail the Offering Package pointed
to UNB's Loan Statement, as well as individual financial statements prepared by the
borrowers and sent to BBOK by UNB. The Offering reported that UNB's experience
with Freeman (Big D's largest owner) "has been very positive and he has shown a
trend of successful operations," R., Vol. XII at 2882; and it added that Freeman
would soon have much greater liquidity as he would be receiving almost $4 million
from Junction City for development work on the Sutter developments. In a closing
bulleted summary of the strengths and weaknesses of the loan, BBOK included as
weaknesses the "Limited liquidity of the members" and "Limited hard cash in the
project." *Id.* at 2884.

### D.     The Participation Agreements, Loan Documents, and Loan Closing

UNB and BBOK signed a Participation Agreement and Certificate, dated April
11, 2008. To provide the required cash or collateral of 15% of the loan (15% of $15.2
million = $2.28 million), it specified that the loan was secured by (1) a "Security
Agreement from Big D Development dated 4-11-08 covering a CD for $205,000";
(2) a "Security Agreement from John Duncan dated 4-11-08 covering a CD for

$1,500,000.00,"[2] R., Vol. XI at 2629; and (3) a mortgage on the land for the development, which had been represented in the Offering Statement as being owned free and clear and having an appraised value of $575,000. On April 11 Freeman, Duncan, Larkin, Fagan, and Skepnek had come to Defendant's office to sign the loan, the mortgage, and the security agreements pledging as collateral two certificates of deposit (identified by their account numbers) authorized by Defendant and dated April 11. Each CD stated that "Depositor . . . has deposited with [UNB] the [relevant] amount," that the opening date was "4/11/08," and that the "opening deposit amount" was, respectively, $205,000 and $1.5 million. R., Vol. X at 2476, 2480. Catherine Gaines, a BBOK credit-administration manager who drafted the agreement, testified that she "described all the collateral based on the documents I had received from [UNB]," which apparently included signed copies of the security agreements for the CDs dated April 11. R., Vol. VII at 1632.

> The Participation Agreement also included the following commitment:
>
> Originating Bank [UNB] expressly states that is [sic] has no actual knowledge, nor made any misrepresentation of fact to Purchasing Bank [BBOK], regarding any material adverse credit experience with Borrower, or any other party to the Loan, including, but not limited to, overdrafts, loan or credit loss charge-offs, classification of loan by bank examiners, bankruptcy proceedings, or loan delinquency of 60 days or more, that has not been disclosed in writing by Originating Bank to Purchasing Bank prior to acceptance of this Participation.

---

[2] Although the Offering Package sent to the participants on March 21 initially represented that there was "$1,400,000 in a certificate of deposit @ UNB pledged to the loan," R., Vol. XII at 2879, this number later increased to $1.705 million in CDs, apparently to help reach the 15% cash-or-equity requirement. The updated CD value (at $1.705 million) and the land (valued at $575,000) together totaled $2.28 million.

R., Vol. XI at 2630.

On April 17 the participant banks each received and signed their own participation agreements with BBOK—referred to as addendums to the UNB-BBOK agreement. These agreements included the same representations as above about the collateral and they stated that the participants were agreeing to the terms and conditions set forth in the UNB-BBOK Participation Agreement.[3]

The loan closed and the first installment of about $2.4 million was disbursed on April 28. The evidence at trial showed that there were no CDs on April 11[4] and the land, rather than being free and clear, was encumbered by prior liens exceeding the value of the land. Contrary to the participation agreements, the CDs were paid for and title to the land was cleared only when the loan was closed—by using proceeds of the Bluejay loan and additional loans to Duncan and Freeman not disclosed to the

---

[3] There was some dispute at trial about when the UNB-BBOK Participation Agreement was signed. The jury was provided two copies of the agreement; both are signed by Defendant and Ellis and the date next to Ellis's signature is April 11 on both. On one, the date next to Defendant's signature is April 28; on the other, there is a clearly different signature of Defendant and there is no date next to it. Defendant maintains that he signed the agreement on April 28 and does not explain when the other copy was executed. But the jury could reasonably infer that the copy with the undated signature was signed before April 17, when the participation agreements were sent to the participant banks. In any event, we fail to see any relevance of the signing date to the fraud allegations.

[4] Defendant suggests that the CDs existed but were just "unfunded." But, as the FDIC examiner testified, "[T]here is [no] such thing as an unfunded CD." R. Vol. III at 642. No one would say that he has an "unfunded $100,000 in his bank account." In any event, the CDs stated that the depositor had deposited with UNB the amount stated.

12

participating banks. In our discussion of the sufficiency of the evidence, we will provide details of the deception involved in this effort.

## II.    SUFFICIENCY OF THE EVIDENCE

"In determining whether the government presented sufficient evidence to support the jury's verdict, this court must review the record de novo and ask only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find Defendant guilty beyond a reasonable doubt." *United States v. Scull*, 321 F.3d 1270, 1282 (10th Cir. 2003) (brackets and internal quotation marks omitted).

### A.    Bank Fraud

The federal bank-fraud statute prohibits the execution or attempted execution of a scheme or artifice (1) "to defraud a financial institution," 18 U.S.C § 1344(1), or (2) "to obtain any of the moneys, funds, . . . or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises," *Id.* § 1344(2). Defendant was charged, the jury instructed, and the jury found him guilty under both prongs of § 1344 for all four counts of bank fraud, each one of which corresponds to a victim bank. His conviction stands if a reasonable jury could have found him guilty under either prong. *See United States v. Iverson*, 818 F.3d 1015, 1026 (10th Cir. 2016).

To prove a § 1344(1) violation, the government must show that "(1) the defendant knowingly executed or attempted to execute a scheme or artifice to defraud

a financial institution; (2) the defendant had the intent to defraud a financial institution; and (3) the bank involved was federally insured." *United States v. Flanders*, 491 F.3d 1197, 1212 (10th Cir. 2007). To prove a § 1344(2) violation, the government can show "(1) that the defendant knowingly executed or attempted to execute a scheme . . . to obtain property by means of false or fraudulent pretenses, representations or promises; (2) that defendant did so with the intent to defraud; and (3) that the financial institution was then [federally] insured."[5] *United States v. Rackley*, 986 F.2d 1357, 1360–61 (10th Cir. 1993). Section 1344(2) does not require intent to defraud the financial institution, just the third party whose property is being taken. *See Loughrin v. United States*, 573 U.S. 351, 353 (2014).

Under both prongs, fraud "requires a misrepresentation or concealment of *material* fact." *Flanders*, 491 F.3d at 1212 (internal quotation marks omitted). The jury was instructed that Defendant could be liable as a principal under 18 U.S.C. § 2 if the jury found that he aided, abetted, counseled, commanded, induced or procured bank fraud. The jury could also find Defendant guilty if he "willfully cause[d] an act to be done which if directly performed by him or another" would constitute bank fraud. R., Vol. II at 360. For each of the four bank-fraud counts, the government alleged that Defendant made or caused to be made three independently sufficient misrepresentations with intent to defraud: (1) that the borrowers were financially strong; (2) that the borrowers would bring the Quinton Point land free and clear of

---

[5] BBOK and the four victim banks are all federally insured.

14

any debt; and (3) that the borrowers had $1.705 million in CDs at UNB as of April 11, 2008.

The government introduced sufficient evidence from which a reasonable jury could find the elements of bank fraud beyond a reasonable doubt. To start with, a jury could reasonably conclude that a competent banker would have been unlikely to participate in the Bluejay loan if any of the misrepresentations had been corrected. To reach this conclusion the jurors needed to be educated on the factors that enter into a banker's decision to grant a loan. They were informed at trial that more is necessary than just a proposed reasonable use of the borrowed money (such as a building project) that is expected to earn a profit. After all, things do not always go as planned. (The record indicates that the completed Quinton Point project sold for less than $8 million, not the proposed $17.952 million.)

Kaye Finn, a senior risk-management examiner for the Federal Deposit Insurance Corporation (FDIC), and representatives from each of the four victim banks identified in the indictment—Blake Heid, president and CEO of First Option Bank; Donald Whelchel, loan officer at Peoples State Bank; Patrick Walsh, a member of the Board of Directors of Lyndon State Bank; and David Brownback, president and CEO of Citizens State Bank and Trust—testified about the types of information banks evaluate and expect to receive when they are asked to consider a loan, enabling them to assess the risk and make reasonable decisions. In addition to the terms of the loan itself, potential lenders consider the *character* of the borrowers, their *capacity* to

15

repay, and what they have pledged as *collateral* (which some of the representatives referred to as the three Cs of credit).

Character refers to how trustworthy a borrower is in repaying its debts. The bank looks at the borrower's credit history and how it has repaid loans in the past as indications of how the borrower will uphold its obligation if a loan is made. Lenders need to know the character of both the borrower and those serving as guarantors on the loan.

Capacity to repay is an assessment of the borrower's overall financial status, including its cash flow, liquidity, and other outstanding debts. To assess capacity, banks rely on financial statements and, as when assessing character, the borrower's loan history. In the context of a participation loan, representations by the originating bank about the history of its relationship with a borrower—who is often unknown to the prospective participants—are critical. Repeat delinquencies and overdrawn accounts "raise[] a red flag." R., Vol. III at 637.

Finally, the collateral pledged to secure a loan reduces risk for lenders in two ways: First, it ensures that the borrower has "skin in the game,"—*i.e.*, that it has its "own money on the line [and not just] borrowed funds." R., Vol. VIII at 1895. As one bank representative put it: "[W]hen people have to put money down . . . , then they usually have a higher tendency to pay those loans back." R., Vol. III at 681. Second, if there are problems collecting the money owed, the banks can rely on the collateral for partial repayment.

16

As the FDIC examiner and the officers from the victim banks testified, banks do not make loans unless they are confident about these three Cs of credit. A reasonable jury could find that the Bluejay loan failed miserably on all accounts. Because of Defendant's misrepresentations, however, the participating banks were in the dark about these serious shortcomings.

### 1.    Financial strength of borrowers

We begin with the allegation in the indictment that Defendant misrepresented the borrowers' financial strength—in other words, their character and capacity to repay the loan. The participating banks based their decisions on the Offering Package—which included and was derived from information provided by UNB. The officers from the victim banks testified that they rely on information from the lead bank and expect it to be forthcoming in describing what it knows about the borrowers. As Brownback of Citizens State Bank and Trust explained: "[W]e really can't judge character ourselves so we're looking for something from the originating bank who does have that ability . . . and . . . character is the [] No. 1 thing in making a loan decision and next is the ability to pay." R., Vol. VIII at 2013–14. Heid of First Option Bank testified that he trusts loan offerings—although completed by another bank—because he "expect[s] bankers to be truthful." R., Vol. III at 685. *Cf.* R., Vol. VIII at 1895 (Walsh agreeing that if the originating bank "knew about a poor history of paying back loans, [he would] have expected that to be communicated to [him]"); R., Vol. V at 1362 (former BBOK employee Dailey testified that "full disclosure"— "put[ting] everything on the table, good or bad," is a "concept well understood in the

banking community"). Indeed, in his testimony in a deposition for civil litigation related to the Bluejay loan, Defendant himself stated that if he were reviewing a participation opportunity, "he would want to know about the stability of the borrower just as if he were originating the loan himself." Ex. 444-D. And he further testified that as a participant bank "you would have to rely more on . . . the bank's history with their borrower," including delinquencies, which would typically be included in a "write up" by that bank. *Id*. To that end, the Participation Agreement, as quoted above, required UNB to provide any adverse information about the borrowers that occurred before acceptance of the participation loan but had not yet been disclosed.

Two statements in the Offering Package indicated that UNB's experience with the borrowers had been a good one. First, the Loan Statement prepared by UNB assigned a risk code of 4—on a scale of 1 (virtually no risk) down to 9 (loss assets)—to the Bluejay loan "because of good collateral values and the financial strength of the borrowers individually and collectively." R., Vol. XII at 2888. UNB's internal loan policy describes grade four as follows: "This rating will be applied to those credits that are of average risk. Typical borrowers are small or middle market operations. Although results may be uneven, only normal amount of monitoring is required." R., Vol. XIV at 3494. Brownback from Citizens State Bank and Trust testified that although each bank has its own risk scale (*e.g.*, 1-to-7, 1-to-10) he could infer that a rating of four "typically" meant that it was "not a problem loan." R., Vol. VIII at 2076. In any event, the statement that the rating was based on "the financial

18

*strength* of the borrowers individually and collectively" would be most peculiar if the author thought the borrowers were financially questionable or weak.

Second, the Offering Package states: "[UNB] reports that their experience with [Freeman] has been very positive and he has shown a trend of successful operations." R., Vol. XII at 2882. It then adds that Freeman will soon be in even better shape:

> It is important to note that Freeman will experience a significant change and increase in his liquidity. He has received word from the City of Junction City that they will be funding, in its entirety, the reimbursements for Big D's development of the Sutter Woods and Sutter Highlands developments will occur in the near future. This will result in proceeds just shy of $4MM to Freeman that will reduce loans at UNB and other debts, reserving an appropriate amount for tax liabilities. His [net worth] will not change significantly as this transaction is already factored in, but he will be come [sic] much more liquid and provide a source for additional capital in this project as needed. On going [sic] lot sales in those subdivisions will provide cash flow as well to reduce debt.

*Id.* at 2883.

The statements in the Offering Package were grossly misleading. The specific note about Freeman expecting to receive $4 million was simply false. It was a reference to the Rural Housing Incentive District (RHID) financing. But, as Fagan testified, Big D had not secured the votes necessary for RHID financing. Three entities needed to approve Big D's application; and although the city and school board voted in favor, the county voted against Big D in December 2007, the month before BBOK's board approved the proposed Offering Package and several months

before it was sent to the participants. Fagan testified that he informed Defendant of this vote.[6]

More important, UNB's relationship with Freeman and the other borrowers was far from positive. Big D and its members had been singularly unable or unwilling to keep up on their obligations to UNB even without the Bluejay loan. UNB records indicate that Big D was having serious problems with cash flow. Operating accounts were frequently overdrawn—with one account being overdrawn for 54 consecutive days from early January through early March 2008 (while the participation loan was under consideration) and another account being overdrawn on 41 days between July 2007 and April 2008. Further, loans made to the Bluejay owners and their related business entities were consistently past due, either because they were not paid at maturity or because periodic payments had not been made. Special Agent Shawn Nickell with the Office of the Inspector General at the Federal Housing Finance Agency examined UNB's account and loan history with the Bluejay borrowers—including the Big D entities and its individual owners—in the ten months leading up to the Bluejay loan (July 2007–April 2008). During that time the owners and business entities had 69 loans outstanding with UNB, nearly all of which were arranged by Defendant. Each month, there were from 6 to 29 loans past due with combined balances ranging from $2 to $7 million.

---

[6] The county commission's vote (2-1) against the application turned out to be void as untimely, so the county allowed Big D to reapply. But the county unanimously rejected the second application in late 2008.

Agent Nickell also examined what happened with the loans that matured (became due in full) during this period. Over the course of the ten months examined, there were 73 instances of loans reaching their maturity dates (including some extended or renewed loans reaching maturity multiple times) and only two loans, totaling just over $200,000, were paid off. He provided a month-by-month summary of past-due balances and matured loans and correlated them with key events in the Bluejay loan approval process. In November 2007 there were 18 past-due loans totaling over $5.2 million; and in December 2007—when Defendant sent BBOK the UNB Loan Statement—there were 29 past-due loans totaling over $7.1 million. All but one loan that came due during those two months was extended or renewed for at least the second time. In January 2008, the month that BBOK approved the Bluejay loan, and in February 2008, when BBOK drafted and sent a copy of its Offering Package for Defendant to review, there were six or seven past-due loans totaling over $2 million. Every loan that came due was extended or renewed. By March 2008, when BBOK sent the Offering Package to potential participant banks, there were 12 loans totaling over $3.8 million that had past-due payments.

Defendant was well aware of these problems. Two of the Bluejay and Big D owners testified that they worked closely with him to manage past-due loans. Fagan testified that between 2007 and 2008, Big D was often "scrambling" to make interest payments and that the Big D owners regularly spoke with Defendant about how to make payments that were due and "what was the plan, how [would] we ever get to where we need to get to pay this stuff off." R., Vol. IV at 810. In late 2007 and early

2008 he personally spoke with Defendant "at least weekly, sometimes multiple times a day, but frequently" about the status of the Sutter developments and outstanding loans. R., Vol. IV at 812–13. Fagan testified that Defendant often decided how to remove funds from Big D's other accounts to take care of delinquent loans if the Big D owners were unable to make the payments: "I trusted that Troy would go to the hottest fire first. And [] at the time that was [] really appreciated by us because it kept us in good standing on loans and kept them renewed so that we could fight another day." R., Vol. IV at 818.

Duncan similarly testified that he was frequently in touch with Defendant or his assistants about his personal loans and that Defendant would often arrange for extensions without Duncan even asking for them. Defendant would call him in to sign the papers. Duncan testified that, at the time, he was agreeable to the extensions: "I didn't have any choice. I couldn't pay them off at that particular point in time, so it was the only methodology for continuing on." R., Vol. VII at 1715.

Fagan and Duncan further testified that throughout this time Defendant arranged loans to the Big D owners to cover past-due interest payments. According to Fagan, in November 2007 he received a call from Defendant to figure out how to arrange for interest payments that were "significant[ly] delayed" on Big D accounts. R., Vol. IV at 819. Big D did not have the $55,000 needed to make the past-due payments so either Defendant or Fagan suggested that UNB issue Fagan a loan, which he would then use to pay the Big D interest due. And Duncan testified that in February 2008, Defendant arranged for a $35,000 loan to Freeman and Duncan to pay

22

down outstanding interest across several loans. Duncan described himself as "insolvent" at that time. R., Vol. VII at 1710. The $35,000 loan was set to mature in just a month, about when the Bluejay loan was expected to close, and, according to Duncan, would provide funds to pay off some loans. Duncan said that Defendant never asked him to send BBOK an updated financial statement after this loan; and there is no evidence this additional $35,000—or any other subsequent debt the owners took on—was reported to the participant banks. Indeed, UNB records of loans made to Duncan (which would have been Defendant's responsibility) showed that Duncan's financial statements already underreported his loans and liabilities to UNB by $1.9 million and overstated the net worth of his related business entity, JDM, by over $800,000.[7]

There was also evidence of other arrangements by Defendant to help the Big D owners stay afloat or at least appear current on their loans. On March 21, 2008—the day that BBOK sent the Offering Package to the participant banks—Defendant arranged for a third party to assume a past-due $842,000 Big D loan, secured by a piece of property the Big D owners had partially developed. The loan was about 100 days past due but could not be renewed because the loan was a participation loan and the participating bank would not agree. It was assumed by Luke and Sheridyn

---

[7] We note that UNB correctly stated the owners' UNB loan exposure in its own December 5, 2007 Loan Summary. But there is no evidence these amounts were updated to reflect additional indebtedness, and an updated financial statement would have been one avenue to do so. Thus, the bankers could have read Duncan's incorrect financial statement (which postdated the Loan Summary) as the most current source of information.

Oehlert. Luke Oehlert had a heating-and-air-conditioning business that did work on Freeman projects, and he became a friend of Freeman.[8] He testified that before he assumed the $842,000 loan, he attended a meeting with the Bluejay borrowers in Defendant's office about securing the Bluejay loan. As he recalled, "It seemed to me like they were grasping at different ideas on how to come up with" the money or collateral required to obtain the Bluejay loan. R., Vol. VI at 1394. With respect to the $842,000 past-due loan, he testified that at the meeting it was decided that after he assumed the loan, the Bluejay owners would still make the payments and manage the land themselves. Fagan and Duncan testified to the same arrangement.

The government introduced deposition testimony by Defendant from a civil case stating that one of the reasons for this third-party assumption was that BBOK expected all of Big D's loans to be current as of closing. Further, this transaction reduced the apparent liabilities of the Big D owners. Duncan testified that he and Freeman were "at the legal lending limit, and I think we had to move that particular loan out." R., Vol. VII at 1726. The assumption enabled UNB to loan additional funds to the Big D owners.

---

[8] Oehlert appears to have done some heating and air-conditioning work on the Sutter developments and he had agreed to buy 50 lots (at $20,000 per lot, with earnest money of $1,000 per lot), but he stopped after building on 12 lots when he saw that the lots were not selling and raised concerns with the Big D owners. When he was approached about assuming the $842,000 loan, he agreed because he thought that in exchange the owners "would let me off the hook" on his commitment on 38 lots. R., Vol. VII at 1391.

In short, during the ten months preceding the Bluejay loan, the Big D owners had between $2 million to $7 million in past-due loans each month, and when payments or loans came due, Defendant routinely arranged for extensions and renewals, and even arranged for additional loans to cover past-due interest payments. The new loan activity included (1) a $55,000 loan from UNB to Fagan to pay down interest due on Big D's loans at the end of November 2007, just before UNB drafted its Bluejay Loan Statement on December 5, 2007; (2) a $35,000 loan from UNB to Freeman and Duncan to pay down their past-due interest in February 2008, the month after BBOK approved the Bluejay loan; and (3) assumption by Oehlert of an $842,000 loan to Big D from UNB (although Big D promised Oehlert to continue making the payments) that was 100 days past due in March 2008—when BBOK sent the Offering to the banks—and that could not be renewed because of opposition by a participating bank. Agent Nickell testified that during the ten-month period there were 73 instances of loans reaching maturity, yet only two loans (a combined $210,000) were paid off during that time.

Representatives from the four victim banks named in the indictment testified about the importance of the above undisclosed information to their decisionmaking. Heid, the president and CEO of First Option Bank, who reviewed the Bluejay Offering Package in 2008, testified that his bank "would not have participated" if it had known that the borrowers had multiple past-due loans, one exceeding 90 days. R., Vol. III at 700. Whelchel, a loan officer at Peoples State Bank who reviewed the Bluejay loan before it was passed on to the bank's loan committee, testified that if his

25

bank had known about the borrowers' past-due loans, overdrawn accounts, repeated extensions and renewals, and loans used to make late interest payments, it would have viewed the borrowers as "high risk" and would not have agreed to participate. R., Vol. V at 1255. Brownback, the president and CEO of Citizens State Bank and Trust who oversaw approval of the Bluejay loan, testified that his bank would have considered the borrowers a "potential problem" if it had known this information and would "[a]bsolutely not" have participated. R., Vol. VIII at 2027. And Walsh, a member of the board of directors at Lyndon State Bank, similarly testified that he would not have viewed the borrowers as financially strong, and that it would have influenced his bank's decision to participate if it had known that the borrowers had multiple past-due loans.

### 2. Collateral—CDs and land

After reviewing the proposed Offering Package, BBOK responded in late January 2008 that it accepted the proposal on condition that the borrowers put down 15% in equity or cash down payment, an increase from the 10% provided in the proposal. As previously noted, the borrowers and Defendant were very concerned about this requirement, expressing doubt that it could be fulfilled. They had virtually no assets that they could pledge to establish their skin in the game: the Quinton Point land was valued at $575,000, but it was subject to liens totaling over $800,000. Nor did they have enough money in a bank account, savings account, or a CD that they could pledge.

Nevertheless, the April 11 participation agreements declared that the loan was secured by (1) a "Security Agreement from Big D Development dated 4–11–08 covering a CD for $205,000"; (2) a "Security Agreement from John Duncan dated 4–11–08 covering a CD for $1,500,000," R., Vol. XI at 2629; and (3) a mortgage dated 4–11–08 on the land for the development, which had been represented in the Offering Statement as being owned free and clear. How was this accomplished?

To begin with, the statement in the participation agreements was outright false. The two CDs did not exist—they had not been funded on April 11, even in part. The April 11 security agreements were worthless when executed (and when the participants agreed to the loan). And the land, rather than being owned free and clear by the borrowers, was burdened with liens exceeding its market value. Defendant has consistently argued, however, "no harm no foul," because the CDs had been funded and the land was free and clear by April 28, the day the loan was closed.

But the jury did not have to buy that argument. There was more than ample evidence showing that the CDs were funded and the land was cleared of liens by methods that would not have been acceptable to the participating banks: the borrowers (through Defendant's good offices) took on significant new debt (substantially reducing their net worth) without disclosure to the banks and, primarily through a sham sale of lumber, used the very money provided by the Bluejay loan to produce the required collateral.

The materiality of the misrepresentations regarding the collateral is perhaps best evidenced by the efforts of Defendant to conceal what was going on and by the

testimony of representatives of the participant banks that the banks would not have loaned their money had they known that the representations were false. It may be a bit heavy going, but we will try to describe Defendant's actions with respect to the purported collateral. We start with Duncan's $1.5 million CD.

Duncan did not have $1.5 million to put into a CD so Defendant proposed that Duncan and his wife borrow money from UNB to create a CD. The Duncans executed a note for a $1.5 million loan on April 11. But the loan proceeds were not disbursed to create the CD until April 28, the day the Bluejay loan closed. (The obvious reason for the delay was that a $1.5 million loan to Duncan would exceed his loan limit until, as discussed later, other UNB loans to him were paid down with proceeds of the Bluejay loan.) The note was secured in part by a separate $750,000 CD owned by Duncan, also dated April 11.[9] But just as Duncan did not have money for the $1.5 million CD in the first place, he also did not have money for a $750,000 CD to secure his loan. That CD was not created until the necessary funds were provided out of the first disbursement (the first "draw") from the Bluejay loan on April 28. All this required Defendant to coordinate the timing of several transactions and create a phony sale.

First, the phony sale. Defendant had to justify distributing money to Duncan from the first draw. The money initially went to Schmidt Builders Supply, a company

---

[9] This $1.5 million loan was further secured by several other real estate mortgages (which were also used as collateral on other loans) and the $1.5 million Bluejay CD itself.

28

managed by Duncan and majority-owned by his wife, purportedly to pay for lumber supplied to the Bluejay project. Before going further, we must pause to recognize that money is not disbursed from a construction loan to the borrower simply because the borrower desires, or even needs, the money. Banks generally impose strict limits on draws from a construction loan. This helps ensure that there is enough money to complete the project as planned and that the loan will be repaid as expected. *See* Alvin L. Arnold & Myron Kove, 1 *Construction & Development Financing* § 4:262 (3d ed.) (July 2022 update) (a fundamental objective of construction loan administration is "[t]o insure that disbursements are made only for work already performed and in place (and for materials purchased and stored but not yet used, if this is permitted) and only in amounts equal to the value of such work and materials"). Typically, money is disbursed only after an independent third party, such as an architect or construction manager, certifies that certain work has been performed or supplies have been provided to the project. *See id.* § 4:273 ("Each request for a loan disbursement should be initiated by an application for payment. This should specify the amount requested and describe its application to construction and indirect (soft) costs on an item-by-item basis.").

In keeping with this industry norm, Fagan testified that he and Defendant worked out the following "draw process" for requesting funds from the Bluejay loan:

> [Defendant] and I agreed—it may have been his idea—that what we would
> do is our superintendent[10] at Bluejay would . . . prepare a draw request for

---

10  Craig Linn was the construction manager on the Bluejay project and is also referred to as the superintendent.

work that he believed had been done. He's out there every day seeing what's happening. Then he would submit that to the bank. The bank would then have a third-party inspector, somebody not related to the bank or Bluejay, inspect to see that that work was actually performed, and then the bank would sign off on those. Checks would be printed and checks would then be brought to me and I would sign them.

R., Vol. IV at 851–52. This was "a safeguard to make sure that . . . you're not saying that work has been completed when it hasn't actually been completed." *Id.* at 852. Fagan testified, however, that he was not involved in the first draw on the loan and that Defendant was responsible for managing its distribution.

The first draw on the Bluejay loan was dated April 28 and totaled a little over $2.4 million. Defendant disbursed: (1) $1.225 million to Schmidt Builders Supply Company; (2) $698,424 to Larkin for excavating work performed by Larkin Excavating; and (3) $243,252 to Big D, the contractor on the project. The balance remained in a Bluejay account. The application for payment for this first draw (what Fagan referred to as a "draw request")—was signed by the construction manager and describes in general terms what work had been performed or materials procured. We are not aware of any evidence of impropriety in the justifications for disbursements to Larkin and Big D.[11] Not so for the Schmidt Builders disbursement.

The application for payment stated that there was $1.225 million worth of materials "stored to date" for the project, with a corresponding invoice from Schmidt Builders for $1,356,338, with the message "[$]1,225,000 1st draw" handwritten on it.

---

[11] As we discuss below, some of these disbursements were used to fund collateral that should have already been in place, but we cannot say that there were misrepresentations about the work completed in the application for the first draw.

R., Vol. XII at 4897. During deposition testimony in a civil case, Defendant testified that he and another UNB employee used this invoice to physically verify that there was enough lumber at two Schmidt Builders locations for the project and that—as indeed reflected on the invoice—he placed a checkmark next to the line items he was able to account for and put an "x" next to line items he could not account for. Because he was not able to account for everything on the invoice during this inventory, he reduced the amount to be paid to Schmidt Builders on the first draw to $1.225 million. (The sum of the items he supposedly verified, however, total to about $800,000, not $1.225 million.)

Duncan provided a different account. He testified that he forged this invoice and that Defendant's inventory was a "charade." R., Vol. VII at 1768. According to Duncan, Defendant wanted false documentation that Schmidt Builders was owed $1.225 million for lumber it had purchased and set aside for the Bluejay project. The documentation would justify taking that sum in the first draw and using the money to help pay for the required collateral and pay down some of Duncan's past-due debt. Defendant first told Duncan he had to sign "a lumber letter for the file." R., Vol. VII at 1751. Fagan testified that he drafted the letter, dated April 16, at Defendant's request. It stated:

> I have been asked to write this letter to you on behalf of Schmidt Builders Supply, Inc. with regards to its purchase of the lumber necessary to construct [Quinton Point Apartments]. As you know, this lumber has been purchased by Schmidt Builders Supply, Inc. for some time and has been paid for in full. The lumber inventory for this project can be found at two of our locations: 1861 E. 1450 Rd., Lawrence, Kansas 66044 and 100 E. 11th

31

> St., Lawrence, Kansas 66044. This lumber is earmarked for this project and can be picked up or identified for delivery to the project site at anytime.

R., Vol. X at 2504. Duncan testified that none of this was true: Schmidt Builders had not yet purchased any lumber for the Bluejay project, there was no lumber earmarked for the project ready to be delivered, nor would Schmidt Builders set aside this much inventory because of possible warping, etc. *See also* R., Vol. VIII at 1919–21 (testimony of Schmidt Builders employee that such a large amount of lumber is usually purchased wholesale and delivered directly to the jobsite because it is expensive to handle the material twice). Duncan signed the letter anyway, though, because the loan had already been approved and "the whole thing [would] fall[] apart" if he did not. R., Vol. VII at 1755.

Duncan testified that Defendant then asked him for an invoice for the first draw. Preparing a proper invoice would be a simple matter if Schmidt Builders, as stated in the lumber letter, in fact had obtained the lumber for the project and had it at its business locations as earmarked for the project. But because none of the lumber at Schmidt Builders was appropriate for the Bluejay project (the project required specialized lumber that Schmidt Builders did not stock), Duncan could not generate a valid invoice. *See* Black's Law Dictionary (11th ed. 2019) (an invoice is "[a]n itemized list of goods or services *furnished* by a seller to a buyer" (emphasis added)); *see also* R., Vol. VIII at 1917 (testimony by Schmidt Builders employee that an invoice is generated "when [the materials are] actually sold or delivered"). Duncan told Defendant he could not produce the invoice because it would "completely blow

32

up my inventory": "I told him I couldn't give him an invoice because in my computer system, as soon as I do an invoice, it automatically relieves the inventory. Well, when that happens, I would have had negative inventory everywhere . . . ." R., Vol. VII at 1773. He testified that Defendant responded: "I don't care how you do it, I need an invoice." R., Vol. VII at 1773.

To avoid removing any inventory from his system, Duncan generated a quote, which simply provides a pricing estimate for customers, and had an employee "photoshop" the word "invoice" on it. R., Vol. VII at 1774. Through "trial and error," he composed a list of lumber that would total to the $1.35 million of lumber that was expected for the project, which Defendant later changed to $1.225 million for reasons unknown to Duncan. R., Vol. VII at 1776. Duncan testified that he knew he was committing a crime when he created the invoice, and he ultimately pleaded guilty to bank fraud in a separate case in part because of his crafting of this invoice.

As for the supposed inventory Defendant performed to corroborate this invoice, Duncan said that he took Defendant and a UNB employee to three Schmidt Builders locations and that they "just walk[ed] through the lumberyard counting lumber" in inventory "to get to this magical number of 1.35 million." R., Vol. VII at 1767–68. Duncan would tell them how many pieces of a certain type of wood were stored in a specific area, they would ask for its value, and Duncan would provide an estimate. He testified that this lumber was "[a]ll just sitting there ready for sale, being moved and as we were counting, you know, putting on trucks, being shipped out." R., Vol. VII at 1766. Defendant never complained that the lumber was not

33

segregated or earmarked for the Bluejay project. Indeed, Defendant admitted during deposition testimony that he had no idea whether the lumber he counted was segregated from other inventory as represented in the lumber letter because this was his first time at a supply store and he did not know how Schmidt Builders stored its lumber. Defendant further testified that he did not know what types of lumber would be used in the project and never reconciled the invoice with the construction plan. Although he placed this invoice in the first-draw application, he did not ask the project construction manager to review or reconcile the invoice beyond the "inventory" Defendant performed. Defendant sent an email to Ellis on April 23, 2008, stating that he "personally went and counted the lumber" at Schmidt Builders on April 21. R., Vol. XIII at 3186.[12]

In the meantime, Defendant was arranging how the first-draw money to Schmidt Builders would be spent. On April 17, 2008, he sent Duncan an email stating he needed Duncan to write four personal checks (on Duncan's account at Commerce Bank & Trust), worth a combined $1,389,950: (1) $750,000 "to put into a CD as additional collateral on the $1,500,000 loan (Larkin is ready to send you $250K of this)"; (2) $250,000 "to pay down our land loan on Quinton Point[]"; (3) $350,000 to pay down a separate $650,000 loan to Duncan; and (4) $39,950 to pay down another Duncan loan. R., Vol. XIII at 3172. He added: "I will have a check for the lumber in

---

[12] Defendant told Ellis that he counted the lumber on April 21, yet the quote Duncan photoshopped into an invoice was not produced until April 24, so it is unclear what Defendant used to count the lumber. Defendant could not account for this discrepancy during his deposition.

the amount of $1,350,000.00[.]" *Id.* Duncan testified that he went to Defendant's office that day and wrote out the four checks (dated April 18), which Defendant put "in his top right-hand drawer," rather than giving them to a cashier to cash. R., Vol. VII at 1763. He further testified that they discussed that the checks would be cashed after he received money from the Bluejay loan's first draw.

Of course, if loan money is being used to pay off other debt and to secure the Bluejay CD, it is not going toward buying lumber for the construction project. As Duncan put it in an email to the Big D and Bluejay owners on April 17, this plan was untenable and hardly appeared to serve his personal interests: "Boy I am excited about this, I get 1350000.00 for a lumber draw, and it costs me $ 1389950.00 in checks. I lose $ 39950, just to get a lumber draw, wow, what a deal. Then somehow I have to ship 1350000.00 worth of lumber that I don't have any money to pay for, I love University national bank. . . ." R., Vol. XIII at 3173.[13]

Defendant cashed Duncan's four checks (which were in Defendant's possession) after the first draw was disbursed—with $1.225 million wired to an account at US Bank in the name of Schmidt Builders, which then wired that sum to Duncan's personal account at Commerce Bank and Trust. Duncan testified that he was "concerned about that large amount of money going into Schmidt Builders Supply and then me having to take it out of Schmidt Builders Supply into my

---

[13] The lumber payment—which was ultimately $1.225 million—was not enough to cover the four checks. The difference came from Larkin who, at Defendant's urging, took out a $500,000 loan that was used for Duncan to buy an interest in Big D and pay for expenses like this.

personal account," but that Defendant told him that "[i]t just had to be done that way." R., Vol. VII at 1779.

During deposition testimony, Defendant testified that these transactions were arranged to all happen at the same time:

> [W]e were funding on the loan and simultaneously advancing money on the construction draw all at the same time, so that this construction draw request could be paid to Big D Construction. Big D Construction could then pay the people that are on this draw[,] which one of those is Schmidt Builders. They would wire out the funds to Schmidt Builders, and, then, John Duncan was going to borrow the money from Schmidt Builders. He was going to use those funds then to help take care of the . . . [the] CDs, payoffs or whatever.

Ex. 445-L. After this testimony was introduced at trial, Duncan testified that he was not borrowing any money from Schmidt Builders.

To put the lumber "sale" in context, the following transactions occurred on April 28–29: (1) The Bluejay loan closed on April 28. (2) Also on April 28, the $1.5 million CD required as collateral for the Bluejay loan was funded through a $1.5 million loan to Duncan disbursed on that date. The $1.5 million CD was also collateral for the $1.5 million loan to Duncan. (3) The only collateral for the $1.5 million loan to Duncan that was not also collateral for other loans was a $750,000 CD in Duncan's name, which was funded from the first draw on the Bluejay loan via the sham $1.225 million sale of lumber by Schmidt Builders. (4) The remaining $500,000 plus received by Duncan from the sham sale went to pay down other loans at UNB, including UNB's mortgage on the Quinton Point land, which we will discuss further below.

Why these transactions were structured precisely as they were is unclear[14]; but it was certainly not because Defendant wished the financial arrangement to be transparent. A jury could conclude that Defendant intentionally misrepresented that Schmidt Builders had purchased and was owed money for over $1.2 million worth of lumber, thereby enabling him to direct money toward paying down loans and funding the Bluejay loan collateral.[15]

The other CD allegedly created on April 11 to secure the Bluejay loan was for $205,000. It, too, was created on April 28 and ultimately funded in significant part by money from the first draw. The $243,252 sent to Big D from the first draw was remitted to Freeman's personal account, from which $66,988 was used toward funding the CD. The balance of the $205,000 came from adding an additional sum of $50,000 to a UNB loan to Freeman that had been extended multiple times (although hardly any of it had been paid down in the three years prior) and from a March 2008 loan from Oehlert to Big D that was supposed to be used for other purposes. These

---

[14] We note, however, that the $1.5 million loan to Duncan (used to purchase the CD required as collateral for the Bluejay loan) would apparently have exceeded his lending limit absent the use of the sham lumber draw to reduce his loan indebtedness to UNB and to purchase the $750,000 CD used as collateral for the $1.5 million loan.

[15] Defendant argues that Duncan did not get more money than he was owed for the lumber because once he started actually shipping (different) lumber to the project, his invoices were not paid. Defendant told Duncan, "That line item has already been paid and there is no available funds to pay for any additional lumber." R., Vol. VII at 1788. But that argument misses the point. The purpose of the sham sale was to get funds *immediately* to create the collateral required for the Bluejay loan—funds that could not be obtained through any legitimate transaction. And, as discussed later, had the participant banks known what was going on, they would not have participated in the Bluejay loan.

debts incurred by Freeman and Big D were not disclosed in any financial statement provided to the participant banks.

The third piece of collateral was a mortgage on the land for the Quinton Point development. According to the title insurer's Commitment for Title Insurance, dated March 12, there were three outstanding mortgages on the land that "need[ed] to be satisfied or released prior to closing," R., Vol. XII at 2867: (1) a mortgage held by Stonehouse Rentals in the original amount of $91,849, (2) a UNB mortgage in the original amount of $360,000, and (3) a mortgage held by AWM Real Estate Fund in the original amount of $368,500. The Stonehouse Rentals mortgage was satisfied by funds from the portion of the Bluejay first draw that was remitted to Freeman on April 28. The mortgage release was filed on April 29.

The UNB mortgage was partially satisfied by a $250,000 check signed by Duncan on April 18 but kept in Defendant's drawer until Duncan received the money from the sham lumber sale when the Bluejay loan closed. For reasons that are not clear from the record, the release of the UNB mortgage was not signed or filed until July 2008. Finally, the owner of AWM signed a release of mortgage on April 28 after the borrowers convinced him to accept as a replacement a second mortgage (behind UNB) on another property. (Earlier that day, Defendant had emailed Fagan to "put the heat on" the owner. R., Vol. XIII at 3201.) The release was filed on April 29.

Agent Schmidt testified that there was no source of "cash equity from the Bluejay borrowers in the Bluejay project that did not come from either loans or the

first draw" of the Bluejay loan. R., Vol. VIII at 1942. This was not what the victim banks wanted or expected.

With respect to the CDs, Heid of First Option Bank characterized Defendant's representation that UNB had two CDs on April 11, when it did not, as "my definition of fraud." R., Vol. III at 703. Brownback of Citizens State Bank and Trust testified that "you can't pledge something that doesn't exist." R., Vol. VIII at 2031. He said that there was "no chance" his bank would have participated if it had known there was "no actual money in the CDs" on April 11 (the purported date of the CDs and security agreements pledging them as collateral) or on April 17 (when the participating banks signed on to the loan). R., Vol. VIII at 2031; *see also* R., Vol. V at 1258 (Peoples State Bank also would not have participated); R., Vol. III at 703–04 (Heid testimony that Duncan's $1.5 million increase in debt to fund the CD should have been disclosed). Walsh testified that "it would have been a big red flag" had Lyndon State Bank known the CDs were not in existence when they signed the loan and that he would have expected Defendant to disclose if the CDs were being generated by loan money. R., Vol. VIII at 1899. He explained that when proceeds from the subject loan itself are used to fund collateral, that "reduces the value of our overall collateral and security on the matter and . . . it's not a loan to fund the CD, it's a loan to build an apartment complex." *Id.* at 1900.

Representatives from the victim banks also testified that they were deceived by the representations about the land being free and clear. Brownback testified that Citizens State Bank and Trust would "[a]bsolutely not" have participated if it had

39

known there were liens on the land that the borrowers could only clear with money from the Bluejay loan itself. R., Vol. III at 2025. As he put it, it was important to have "the bare land come to the project from the borrowers free of liens because that was . . . part of their down payment or . . . equity input. If it came from our loan, then we made the down payment." R., Vol. III at 2029. Walsh of Lyndon State Bank echoed Brownback's testimony: using loan money to clear liens "lowers the amount of overall collateral because some of it is used to pay other creditors. And we're assuming that the collateral is securing our loan, not [] paying back others." R., Vol. VIII at 1898–99. Heid of First Option Bank stressed the importance of the free-and-clear commitment to his decision: "[I]f this is part of your down payment, you're looking for your project to be as it's stated. Free and clear is down payment money, so it's part of that 15 percent that we were supposed to have for this loan. Also, if there's other mortgages or other indebtedness, that means there's more leverage, so . . . you've got to make sure you disclose that properly." R., Vol. VIII at 686–87. He would have therefore expected the Offering Package to "state[] . . . that there is a previous mortgage that's being paid off . . . . [and] where those funds were coming from." R., Vol. VIII at 687; *see also* R., Vol. V at 1252–53 (testimony of Whelchel that Peoples State Bank would not have participated if it had known the land was encumbered and loan funds were being used to satisfy those mortgages). None of the bank representatives backed off during cross-examination from this testimony regarding the collateral.

40

In light of the testimony by the bankers, the jury could reasonably infer that Defendant, as a banker with substantial experience and holding an office of substantial responsibility, knew that other banks would not participate in the loan if they were fully informed about what he knew. From this perspective, the jury could reject Defendant's arguments that the prosecution was quibbling about technical defects that were consistent with his limited obligations as the lead banker.

Defendant's other attempts at defending his failures to disclose could also be reasonably rejected by the jury. First, Defendant maintains that Ellis and Gaines at BBOK understood that "the loan closing, lien clearings, CD funding, and first draw were timed to close simultaneously" and that he is not responsible if BBOK made misrepresentations to the contrary. Aplt. Br. at 32. He notes that UNB's Loan Statement represented only that the borrowers "*will bring* the land free and clear of any debt," R., Vol. XII at 2887 (emphasis added), which they eventually did, and the "loan documents imposed no . . . prohibition" on using loan funds to clear the liens, Aplt. Br. at 16.

But as testimony by the participating bankers makes abundantly clear, pledging free-and-clear land as collateral means that it will be clear before closing and funding. And Defendant points to no evidence that either Ellis or Gaines understood that the mortgages could not be fully paid without using proceeds from the first draw. Although emails between Defendant and Ellis indicate that Ellis knew the liens had not been cleared as of April 16, 2008 (the day before the participants signed), and Gaines testified that BBOK knew the land had not yet been cleared even

41

after the participants signed, the ultimate deadline was that the liens be released before closing. Indeed, the title insurance commitment submitted by Defendant to BBOK states that the three liens "need to be satisfied or released prior to closing." R., Vol. XII at 2867. And Gaines testified that bringing the land free and clear "was a condition of funding." R., Vol. VII at 1638. Although she had occasionally seen first draws being used to clear up liens, such an arrangement would be "disclosed and fully understood by the lenders, how the loan would fund and what the funds were for." R., Vol. VII at 1672–73. Here, there is no evidence that Defendant communicated his intent to pay off some of the outstanding mortgages with funds from the first draw. On the contrary, the jury could infer that Defendant employed complex arrangements to obscure that what was really going on was the use of loan proceeds to make mortgage payments. Thus, a jury could easily have decided that Defendant intentionally misled both BBOK and the participants to believe that the land would be (and was) clear before closing.

Defendant also claims that "powerful evidence introduced and sponsored by the Government definitively proved that Gregory gave Ellis and BBOK the full story on the CDs' funding and the entire closing process." Aplt. Br. at 31–32. But this is claptrap. The evidence referred to is merely deposition testimony of Defendant in earlier civil proceedings. As the government notes, it never endorsed the truth of everything Defendant said in his testimony, which it offered into evidence only to show "Gregory's involvement with BBOK, and his knowledge and intent to defraud." Aplee. Br. at 41. Defendant does not add to the credibility of his arguments by

42

suggesting that the government in any way endorsed or sponsored the truth of Defendant's self-serving deposition testimony.

Defendant further argues that the participant banks were not deceived about the CDs because the documents produced at closing included a computer screenshot showing that the CDs were not created until April 28. But that evidence merely presented a question for the jury's consideration. The jury could properly infer that in light of the prior documentation showing the CDs were created on April 11, any banker seeing the screenshot could easily, and reasonably, have overlooked a line entry on a printout that looked routine. Indeed, the only person who admittedly saw the computer screenshot at the closing, Gaines from BBOK, testified that she did not pay attention to anything other than the amount. After all, she had previously seen copies of the original documents dated April 11. Nor would an entry showing a date of creation on April 28 have disclosed to the participants that the Bluejay loan money and other loan funds were being used to make those CDs possible. The jury could properly find that once Defendant had fraudulently induced the participating banks to commit to their loans, a last-minute "correction" in a buried line of an obscure document amid a host of paperwork could not "cure" his fraud.

Moreover, Defendant cannot escape responsibility for failing to disclose important information to the participating banks by blaming BBOK. BBOK obtained its information about the borrowers and their transactions with UNB from UNB, and testimony strongly indicated that anything of importance (except paperwork transfers) came from Defendant. Also, the testimony by Fagan and Duncan showed

43

what a great interest Defendant took in trying to keep the borrowers afloat and to assure the Bluejay loan would be accomplished. The jury could readily infer that Defendant was fully aware of and approved—indeed, caused—every disclosure to the participating banks and knew that they would be very interested in the undisclosed matters that contradicted representations in the Offering Package and participation agreements. In particular, it was Defendant's own Loan Statement, to which BBOK refers the participants on the very first page of the Offering Package, that represented the loan as one of average risk due to "good collateral values and the financial strength of the borrowers individually and collectively"—although Defendant was intimately familiar with the borrowers' past-due debt and their inability to come up with the required cash or collateral. R., Vol. XII at 2888.[16] And the jury could easily infer that Defendant must have been the source of the statement, which Defendant knew to be untrue, that Freeman would soon be receiving $4 million from Junction City for the Sutter developments.

---

[16] The jury could also reasonably reject Defendant's attempts to characterize UNB's Loan Statement as "Bartlow's independent" work with which the Defendant merely agreed. Aplt. Br. at 34–35. Bartlow testified that Defendant supplied the information underlying the Loan Statement—indeed, that he "would just work with the data that the loan officer provided," R., Vol. VII at 1555; that Defendant reviewed the Loan Statement after Bartlow completed it; and that typically the loan officer would determine the risk rating and then discuss it with Bartlow. A reasonable jury could conclude that Defendant directed Bartlow's work and was fully aware of any misrepresentations. This is an especially reasonable inference given that Bluejay was a new entity with no borrowing history of its own, and as loan officer on nearly all of the owners' UNB loans, Defendant had superior knowledge of the various accounts and histories.

In addition, Defendant effectively warranted that there was no adverse information to report when he signed the Participation Agreement with BBOK (on whichever date he signed), which stated that UNB "has no actual knowledge, nor made any misrepresentation of fact to Purchasing Bank [BBOK], regarding any material adverse credit experience with Borrower." R., Vol. XI at 2630. Although, as Defendant notes, breach of this provision does not in itself prove fraud, his confirmation that he was not withholding adverse information speaks to his knowledge that BBOK and the participants relied on this information being disclosed and to his fraudulent intent in withholding it. It would have been reasonable for the jury to infer that either Defendant was responsible for the nondisclosure or that he intentionally failed to correct the error.

The jury could also consider the actions Defendant took to conceal the borrowers' true financial position. To create the appearance that the borrowers were taking care of their debts to UNB, he granted numerous renewals and extensions of past-due loans that went unreported—even after UNB submitted the loan to BBOK and BBOK solicited participant banks. Of particular import is Defendant's arranging for the Oehlerts to assume an $842,000 UNB loan to Big D that was 100 days past due in March 2008 and could not be renewed because of opposition by a participating bank. The borrowers and Oehlert met with Defendant in his office to discuss this assumption and the borrowers committed to Oehlert that they would continue to make the payments on the loan. BBOK and the participants were kept in the dark

45

about the recent inability to pay off the large loan to UNB and the borrowers'
obligation to Oehlert to make the payments on his $842,000 loan.

Perhaps most blatant was the misrepresentation that the CDs for $1.5 million
and $205,000 at UNB were available as collateral on April 11, 2008. Defendant
signed phony documents describing the CDs, referencing their account numbers, and
creating security agreements dated April 11. Yet Defendant needed to make new
loans and take money from the first draw on the Bluejay loan ("justified" by a phony
lumber sale) to fund those CDs (directly and indirectly). Why go through such
machinations if everyone understood (or did not care) that the funding for the CDs
was to come out of loan proceeds? Why not straightforwardly create the necessary
checks or fund transfers directly out of the loan proceeds?

Finally, need we say more about Defendant's sham lumber sale? If nothing
else, the jury could properly infer from his actions that he possessed the requisite
fraudulent intent when he deceived his fellow bankers.

In sum, there was no lack of evidence that Defendant created (caused) and
engaged in a scheme to defraud the victim banks into participating in the Bluejay
loan.

### B.     Making False Bank Entries

Defendant was also convicted on two counts of making false bank entries. *See*
18 U.S.C. § 1005. To prove a violation of § 1005, the government must prove that
"(1) defendant made a false entry in bank records, caused it to be made, or aided and
abetted its entry; (2) defendant knew the entry was false when it was made; and

46

(3) defendant intended that the entry injure or deceive a bank or public official."
*United States v. Gallant*, 537 F.3d 1202, 1227 (10th Cir. 2008) (internal quotation marks omitted).

The basis for the government's false-bank-entry charges was Defendant's creation of security agreements pledging nonexistent CDs at UNB as collateral for the Bluejay loan. First, it is undisputed (1) that Defendant created certificates, collateral receipts, and security agreements dated April 11 representing that the borrowers had $1.5 million and $205,000 in CDs at UNB on April 11, 2008; and (2) that those CDs were not actually created until April 28, 2008—and funded in part with proceeds from the Bluejay loan. The second and third elements of the offenses are established by the same evidence supporting Defendant's bank-fraud convictions based on misrepresentations about the CDs and related documents, which were referenced in all the participation agreements. A reasonable jury could conclude that Defendant knew that the banks would not have participated if they had known that the borrowers did not have the requisite funds on deposit at UNB, and that he created the above phony documents to keep the participant banks from knowing the truth.

Regarding this first element, Defendant argues that these documents were "not false 'entries' in UNB's records," because the government did not show that they were actually entered into "UNB's books of account" before the loan closed. Aplt. Br. at 39. But the statute itself prohibits false entries in "*any* book, report, or statement of such bank, company, branch, agency, or organization." 18 U.S.C. § 1005 (emphasis added). Defendant cites no authority that limits § 1005 violations to entries

47

in books of account, and courts have found a great variety of records actionable. *See, e.g.*, *United States v. Foster*, 566 F.2d 1045, 1052 (6th Cir. 1977) (interoffice memo intended to deceive bank directors constitutes false entry; stating that no authority supports the argument that false entries are only those "contained in formal bank financial accounting records"); *United States v. Flanders*, 491 F.3d 1197, 1205, 1214 (10th Cir. 2007) (unofficial board minutes altered to omit conditions for loan approval can constitute false entry); s*ee also* John K. Villa, *Banking Crimes: Fraud, Money Laundering and Embezzlement* § 3:37 (2021).

Next, Defendant turns to the purpose of § 1005, which is to "'give assurance that upon an inspection of a bank, public officers and others would discover in its books of account a picture of its true condition.'"[17] Aplt. Br. at 38 (quoting *United States v. Darby*, 289 U.S. 224, 226 (1933)). He maintains that "a bank examiner inspecting UNB's records on or after April 28 would see the true picture of the bank's books and records" and the fact that the agreements and CDs "showed dates of April 11, 2008 would not have obscured the true picture." Aplt. Br. at 39. But as the government points out: "Nothing in Section 1005 exempts a defendant's false bank entries just because some other, later entries—made after the defendant has

---

[17] Relatedly, he maintains that he could not have made false entries with the intent to deceive the victim banks because "there was no evidence that the victim banks had any right to inspect UNB's records." Aplt. Br. at 40. But § 1005 prohibits false bank entries made "with intent to injure or defraud such bank, company, branch, agency, or organization, or *any other company, body politic or corporate, or any individual person*." 18 U.S.C. § 1005 (emphasis added). The victims (such as the banks here) need not be only those with a right to inspect a bank's records.

successfully defrauded his victims—assertedly ameliorate the false entries' misrepresentations." Aplee. Br. at 49–50; *see Phillips v. United States*, 406 F.2d 599, 601 (10th Cir. 1969) ("[T]he making of a false entry in the books of a bank with intent to deceive is all that is necessary to bring the act within the meaning of the statute, and the fact that its falsity may be exposed by an examination of other books of account, does not render it any the less a false entry made with intent to deceive." (internal quotation marks omitted)). The point is that the false entries gave a false picture of circumstances before closing, which was all Defendant needed.

A reasonable jury could find beyond a reasonable doubt that Defendant made false entries in UNB's records with the intent to deceive banks into participating in the loan.

## III.    PROSECUTORIAL MISCONDUCT

Defendant complains that the district court improperly denied his motion for new trial based on prosecutorial misconduct during closing argument. In arguing that none of the victim banks would have participated in the Bluejay loan had they known the truth, the prosecutor enacted a fictitious presentation to the banks by Defendant during which Defendant discussed information not previously disclosed to them. Defendant contends that this dramatization was "grossly misleading" because it was "based on facts not in evidence." Aplt. Br. at 25. We disagree. The prosecutor properly used a dramatic device to persuade the jury of an essential element of the offense. In doing so he did not go beyond reasonable inferences from the evidence at trial.

49

### A. General Principles

The form of closing is a matter of some importance. There is no question that a closing argument may deny the opposing party a fair trial. But in the American tradition a closing argument can be a quintessential example of the art of persuasion. That tradition is a great one, and courts should be cautious about imposing too stringent restrictions. Few human endeavors are more fraught with difficulty than persuading another person of the rightness of one's view, particularly when time or space is limited. Finding the perfect note to ring is a product of reflection, insight, empathy, and luck. Justice will not be served if we are too quick to constrain the imagination of litigators.

One could point to myriad examples in life and literature of imaginative arguments that carried the day. We will confine ourselves to only one, which resembles what happened at Defendant's trial. Not that long ago (and perhaps still), more trial attorneys looked for guidance in Professor James McElhaney's columns in the *Litigation* journal and his books than any other source. To illustrate the difference that creativity can make in the effectiveness of closing argument, he described what happened at an American Bar Association convention when a mock prosecution was tried twice to two different juries of legal assistants. The evidence presented was the same in both trials. Bonnie Lynch had put up Frank Adams in her apartment for a weekend and then drove him to a bus station across the state line. Adams was a fugitive from justice. The only issue was whether Lynch knew that about him. Her friend Jesse Nolan had asked her to accommodate Adams. Testifying under a grant of

immunity, Nolan said that he had called Lynch and told her "all about" Adams.

James W. McElhaney, *Trial Notebook* 699 (4th ed. 2005). The verdict at the first trial

was 7-5 for conviction. Defense attorney John Burgess thought he could do better,

but he changed only the closing argument. At the first trial he had emphasized how

the grant of immunity gave Nolan an incentive to lie. The second time around he

tried something more dramatic. He reenacted the telephone conversation between

Bonnie Lynch and her accuser, Jesse Nolan, using an imaginary telephone in each

hand and changing his voice to fit either Bonnie or Jesse:

> "Hello?"
> "Hello, Bonnie?"
> "Yes. Who is this, please?"
> "This is Jesse—Jesse Nolan."
> "Oh, hi, Jess. How are you?"
> "I'm fine. Say, Bonnie, I wonder if you might do me a favor."
> "I will if I can. What is it, Jesse?"
> "I have this friend here from out of town, and I have to find a place for him to stay. I wonder if you might put him up for the weekend?"
> "Gee, Jesse, I don't know. There is just me and Gretchen living here—I am not sure."
> "Oh, he wouldn't be any trouble. He's a real nice guy."
> "I'm really not sure, Jesse. Who is this person, anyway?"
> "His name is Frank Adams, and he is an old friend of mine."
> "Oh, Jesse, I don't think so . . ."
> "Bonnie, don't worry. He is a real good guy. He is a bag man for the mob in Nashville. There is a federal fugitive warrant out for his arrest, and he is on his way to Dallas to bribe a local official."
> "Well, if that's the case, send him right over."

*Id.* at 700. This time, the jury burst out laughing and returned a unanimous verdict of

not guilty after five minutes of deliberation.

The law does not prohibit such rhetorical devices. "Arguments may be

forceful, colorful, or dramatic, without constituting reversible error. Counsel may

51

resort to poetry, cite history, fiction, personal experiences, anecdotes, biblical stories, or tell jokes." *Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1133 (10th Cir. 2009) (Gorsuch, J.) (citations and internal quotation marks omitted)). And "so long as it is supported by the facts and circumstances properly in evidence, [argument] may be couched in vigorous and pungent phrases, embellished with oratorical flourishes, and illuminated by pertinent illustrations." J. Alexander Tanford, *Closing Argument Procedure*, 10 Am. J. Trial Advoc. 47, 52 (1986) (internal quotation marks omitted); *see also United States v. Hammers*, 942 F.3d 1001, 1016 (10th Cir. 2019) (Prosecutors are "entitled to a reasonable amount of latitude in drawing inferences from the evidence during closing arguments." (internal quotation marks omitted)); *United States v. Young*, 955 F.2d 99, 109 (1st Cir. 1992) (Breyer, C.J.) (prosecutor's "simplified" hypotheticals starting with straightforward embezzlement and building up to a more complex scheme like the one at issue in the case "did not surpass outer limit of permissible argument" despite defendant's contention that the jury was invited to convict based on "inflammatory hypotheticals" rather than the facts of the case (internal quotation marks omitted)).

Of course, there are limits. Some are constitutional, such as the prohibition on commenting on a defendant's failure to testify. Others concern more general conceptions of fairness. McElhaney has listed the following "basic rules of final argument": Counsel "may not misstate the evidence or the law," "argue facts that are not in evidence," "state [their] personal belief in the justice of [their] cause,"

52

"personally vouch for the credibility of any witness," "appeal to passion or prejudice," or "urge an irrelevant use of evidence." McElhaney, *supra*, at 669.

Absent specific constitutional command, "improper remarks require reversal . . . only if the remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir. 2006) (internal quotation marks omitted). We place the remarks in the context of the entire proceeding, including the strength of the evidence against the defendant and cautionary steps taken by the court. *See id.*; *see also United States v. Christy*, 916 F.3d 814, 824 (10th Cir. 2019). "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." *Bland*, 459 F.3d at 1024.

### B.    The Government's Closing Argument

Where does the closing argument in this case fit in? The theory of the prosecution was that Defendant had deceived the victim banks by providing misleading information. As with any claim of fraud or deceit, the jury must decide whether a false or misleading statement was material. It must consider a counterfactual: would an alleged victim have likely acted differently if (contrary to fact) the victim had been provided full and accurate information. One tried-and-true technique for persuading the jury would have been simply to argue how important the undisclosed information would be to a conscientious banker. The prosecution, however, decided on a more dramatic approach—asking the jury to imagine what would have happened had Defendant been candid. After asserting that "[n]o bank

53

would have given money to these borrowers under these circumstances if they had known the truth about [the loan]," R., Vol. IX at 2135, the prosecutor asked the jury to imagine a meeting of Defendant with the victim banks (a meeting that everyone knew had never occurred) on April 17, 2008 (before the bankers committed to participating in the Bluejay loan) at which Defendant told the bankers a number of things about which they had not been informed: "[I]magine with me a boardroom . . . and in this boardroom are [representatives of the] banks who gave money in this loan. [A]lso . . . imagine that instead of having to rely on the paper documents that they were given, that [Defendant] has the opportunity to pitch this loan to them directly." *Id.* Pretending to be Defendant giving his pitch to the bankers, the prosecutor said such things as:

> [I] want to be honest, so I have to tell you a few other things too. The 15 percent cash equity down payment that BBOK required the borrowers to come up with really won't be coming from their own cash reserves or property.
> The fact is I've signed loan documents with Duncan to loan him $1.5 million to put into a CD. He has no way of paying that loan money back because he's highly leveraged, and he has no assets that he can sell to make that money.
> But we need the money to make up the 15 percent, so that's what I'm going to do.
> Now, I know that your documents already refer to the $1.5 million CD, but right now it has no money in it. It's worthless. I had to lead you on a bit there, but I've told Mr. Duncan to write me a $750,000 check to act as collateral for that loan. He didn't have the money in his account to cover that check, so I couldn't fund the CD.
> He and I both knew that when I told him to write the check, that he didn't have the money, so I just put it in my desk drawer until I know that he has the money.

54

*Id.* at 2150–51. What the prosecution is asking the jury to do is to visualize the counterfactual situation that it would have to consider anyway—especially when the defense contended that there was nothing irregular about how Defendant and the borrowers arranged to meet the loan conditions, such as by using loan proceeds to fund the CDs pledged as collateral.

We leave to others to decide whether the approach taken by the prosecution was a good idea or was well executed at Defendant's trial. What we decide is merely that there was nothing improper in this approach.

In district court, defense counsel complained about the hypothetical from the outset. He objected that the prosecutor was "coming up with hypotheticals. Closing argument is supposed to be based on the evidence from the trial. He's making stuff up . . . ." *Id.* at 2136. At bench conferences he argued: (1) "[C]losing argument has to be based on the evidence from the trial." *Id.* at 2138. (2) "The prosecutor is saying that [Defendant] said things that there's no evidence about." *Id.* at 2141. And (3):

> [H]e's not talking about the evidence of the case. He's not talking about the truth of the case. [The prosecutor] is making up whatever he wants to say. He is telling the jury that [Defendant] would say these things. That's not true. He's creating a complete farcical, fantasy world of information . . . . He's acting like [Defendant] actually said these things. There's no evidence of that. . . . [The prosecutor] has told the jury that this conversation is going on for all of the participant banks in some meeting that never took place.

*Id.* at 2141–42. In response, the prosecutor said: "[M]y point is [Defendant] did not say these things. That's the whole point. He didn't say these things. I'm going to make the very point [defense counsel] just said." *Id.* at 2142.

After defense counsel's first objection, the court told the jury: "Again, jury members, . . . closing arguments are what the attorneys believe in regards to the evidence in this case. It's not evidence." *Id.* at 2136. After overruling a second and third objection, the court recognized defendant's continuing objection and asked (at the bench) that counsel refrain from interrupting with the same objection on the same grounds. The court then instructed the jury as follows:

> Again, jury members, something I mentioned at the beginning of the closing argument, and I'll repeat [] this time is what the attorneys say not only at this point of our trial, but at any point, their comments or their statements or, in this case, their arguments is not evidence.
>
> The evidence is only what was presented to you through the witnesses' testimony and the exhibits that were admitted or stipulations. That's the evidence that you must make your decision on.
>
> [C]losing arguments are there for the attorneys to argue in regards to what they believe the evidence has shown or in this case what counsel identified is as a contrast or analogy or hypothetical, what they believe in regards to that as it relates to the evidence. . . . Please keep that in mind.

*Id.* at 2146–47.

The district court properly rejected the objection. The prosecution could have gone through all the things that Defendant had failed to disclose about the loan and then argued that the participant banks would have backed out if they had known that information. He merely dramatized the point by asking the jurors to imagine (as part of the counterfactual) how the participant bankers would have reacted had Defendant personally informed them of the true state of affairs. Not only did the prosecutor make clear that Defendant had not made the statements, *his whole point* was that Defendant had not disclosed the information. In *Abela v. Martin*, 380 F.3d 915, 929–

56

30 (6th Cir. 2004), the prosecutor presented a hypothetical conversation between the defendant and a friend before they returned to a house where they had just been in a fight. It was an "attempt to explain why the two might have returned to the party after being told to leave" that illustrated the government's theory of the case and challenged the defendant's theory of self-defense. *Id.* at 929. The appellate court said:

> We would be highly concerned if the prosecutor presented the conversation as factual. But, here, the prosecutor prefaced this part of his argument by advising the jury: "and exactly what was said probably we'll never know but probably went something like this . . . ." Because of this preface, we are persuaded that the jury would not have been misled into believing that the prosecutor was quoting from an actual conversation, but that he was rather presenting beliefs he would have the jury infer from the evidence presented at trial.

*Id.* at 930. Here there was even less danger that the jury would think the prosecutor was reciting evidence, because the prosecutor emphasized that Defendant had *not* made the statements.

Nor did the prosecutor suggest that Defendant should have communicated directly with the victim banks. The uncontested evidence at trial was that BBOK managed communications with the participants, and the prosecutor prefaced his dramatization by asking the jury to imagine that, rather than the participants relying on "the paper documents," Defendant "has the *opportunity* to" speak with the banks directly. R., Vol. IX at 2135 (emphasis added). (The prosecution theory, for which there was more than ample evidence, was that BBOK depended on Defendant for accurate information about the borrowers and transactions at UNB, but Defendant

57

provided BBOK with false, misleading, and incomplete information.) We see nothing unfair in the prosecutor's approach.

It would be something else entirely if the prosecutor had Defendant telling the participant bankers things for which there was no evidence—say, the prosecutor's imagined meeting included a statement by Defendant that he had been bribed by one of the borrowers. During trial, however, defense counsel did not object on that ground to any of the closing argument by the prosecution; defense counsel never pointed to a specific statement in the hypothetical speech as being unsupported by evidence at trial. Arguing that there is no evidence that Defendant made the hypothetical statements recited in closing argument is not the same as arguing that the evidence fails to support the underlying substance of those statements. In his briefs in this court Defendant points to a few statements by the prosecutor that he contends were not supported by evidence at trial, such as Defendant's fear that he would lose his bonus and perhaps his job if he could not clean up the loans for the Sutter developments or that UNB itself could have trouble with federal regulators because of his manipulation of those loans. In our view, however, those comments were reasonable inferences from the evidence (would it be unreasonable to infer that Defendant would have been fired and federal bank regulators would have been upset if the bank had lost millions of dollars on the Sutter loans and Defendant's cover-up of the problem loans had been unearthed?), and were certainly not obviously

58

improper.[18]

Defendant tries to compare the prosecutor's closing argument to the plaintiff's closing argument in *Whittenburg*, where we reversed a judgment because of improprieties in the closing argument. 561 F.3d at 1127. But the only common feature of the two closing arguments is that they conveyed a hypothetical communication.

*Whittenburg* was a negligence case against a trucking company by a driver who was seriously injured after he hit one of the defendant's stalled trucks on a dark road. *See id.* at 1124. During closing argument plaintiff's counsel asked the jury to imagine that the defendant delivered a letter to plaintiff's children shortly after plaintiff left the house the night of the accident. *See id.* The letter began: "That was the last time you will ever see your dad as you now know him. You should let your siblings know this." *Id.* at 1125. Then the fictitious letter in effect confessed that various actions by the defendant's employees caused the accident and that they failed

---

[18] "We review arguments not raised in district court for plain error." *United States v. Piper*, 839 F.3d 1261, 1265 (10th Cir. 2016); *see United States v. Gonzalez-Montoya*, 161 F.3d 643, 650 (10th Cir. 1998) (reviewing for plain error when defense counsel objected to statements in closing argument on different ground from what was argued on appeal). "Under the plain error standard, [Defendant] must demonstrate: (1) an error, (2) that is plain, meaning clear or obvious under current law, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Piper*, 839 F.3d at 1265–66. Moreover, when, as here, "an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise." *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019).

to properly respond. *See id.* at 1125–26 ("Once stuck on the highway, our drivers will ignore the law, and they will ignore our company procedures, and recklessly set a trap for your dad."). And it described in detail the physical pain the plaintiff was in during and after the accident. *See id.* at 1126 ("[H]e has to endure the claustrophobic remains of what's left of his pickup for nearly two hours while rescue workers work to free him . . . .").

In addition, much of the letter was devoted to "vituperative attacks on defendants and their counsel," which "had no basis in evidence adduced at trial." *Id.* at 1129; *see, e.g.*, *id.* at 1126–27 ("We will do everything in our power to convince the jury that your dad was really not all that injured in the first place, and that your dad is overreaching in trying to prove his damages. Of course, if none of that works, our lawyers will accuse your dad of being a failure because his law firm used to have 20 members and now it only has five." (brackets omitted)). The letter then admitted that the defendant company improperly took the case to trial and was spending a lot of money to "avoid full responsibility"; it also admitted that the defense trial strategy involved ridiculing the plaintiff and "using smoke and mirrors and half truths." *Id.* at 1126–27.

We stated: "We are compelled to reverse and remand for a new trial because of pervasive and improper remarks by Mr. Whittenburg's counsel in closing argument to the jury. Counsel spent the bulk of his argument placing before the jury fictitious admissions never uttered by defendants and launching vituperative and unprovoked attacks on defendants and their counsel." *Id.* at 1124.

60

To be sure, in the case before us there was also no evidence that Defendant ever said what was put in his mouth by the prosecutor at closing argument. But there are two critical differences between the hypothetical "confessions" in this case and *Whittenburg*. First, in *Whittenburg* "the content of this particular imagined letter included a great many facts about Mr. Whittenburg's children and [the trucking company's] conduct that lacked any basis in the evidence adduced at trial." *Id.* at 1128. In contrast, in this case the evidence supported essentially everything that Defendant hypothetically confessed. Second, there was no apparent purpose for having the trucking company confess in the *Whittenburg* letter other than to suggest its admission that it engaged in various wrongdoing. In this case, however, the whole point of the hypothetical was that Defendant never admitted his concealment of material facts—that is, he did not provide full disclosure to the victim banks of the problems with the proposed loan. The prosecutor was arguing that Defendant should have disclosed those matters and the loan would never have gone through if he had done so. In short, the prosecutor was pointing out that the disclosures omitted by Defendant were material. No juror could have misunderstood this point.

And there is at least one other important ground for distinguishing the two cases. In this case there was nothing comparable in the prosecution's closing argument to the appeals to prejudice in the *Whittenburg* closing argument, such as the attacks on the trucking company and its attorney for which there was no supporting evidence in the record. *See id.* ("The permissible limits of closing argument were exceeded in this case in two principal ways. First, counsel referred extensively to

61

evidence not in the trial record. Second, without apparent provocation or basis in the record for doing so, counsel flooded his argument with abusive references to his opposing party and counsel."); *see also id.* at 1129 ("The invented facts placed before the jury were also plainly calculated to arouse its sympathy, evoking, as they did, images of plaintiff's children receiving for the first time news of their father's injuries, implicitly asking the jury to place themselves in the shoes of the children.").

It is also worth noting that although in *Whittenburg* "the parties [fought] considerably over the propriety of ever using an imaginary letter as a way to structure a closing argument," we said that "we need not resolve today an abstract debate over the proper *form* of closing arguments." *Id.* at 1128. The problem was the content. In this case we see no problem with the content, which amounted to merely an argument that the omitted disclosures were material.

In short, we see no support in *Whittenburg* for Defendant's challenge to the

closing argument by the prosecutor.[19] The district court did not err in denying

Defendant's motion for mistrial.

_____

[19] The parties agree that our standard of review of the closing argument is de novo. They cite dicta in United *States v. Anaya*, 727 F.3d 1043, 1052 (10th Cir. 2013) and *United States v. Christy*, 916 F.3d 814, 826 (10th Cir. 2019), which state that we review overruled prosecutorial-misconduct objections de novo, whereas sustained objections followed by mistrial or new-trial motions are reviewed for abuse of discretion. Other authority, however, suggests that our review is for abuse of discretion when an objection is overruled. *See United States v. Harlow*, 444 F.3d 1255, 1265 (10th Cir. 2006) (reviewing mistrial motion for abuse of discretion where trial court failed to sustain objection); *United States v. Broomfield*, 201 F.3d 1270, 1276 (10th Cir. 2000) (court failed to sustain objection and denied motion for new trial); *United States v. Kravchuk*, 335 F.3d 1147, 1153 (10th Cir. 2003) (denial of simultaneous objection and motion for mistrial reviewed for abuse of discretion); *United States v. Gabaldon*, 91 F.3d 91, 94 n.2 (10th Cir. 1996) (making no distinction between overruled or sustained objections); *see also United States v. Taylor*, 514 F.3d 1092, 1097 n.2 (10th Cir. 2008) (Gorsuch, J.) ("Our case law requiring *de novo* review of the decision to overrule an objection to misconduct is admittedly at odds with holdings of most of our sister circuits . . . ."). (There is no difference between the two standards of review when the issue is purely one of law, as when the closing argument is challenged for violating a constitutional command. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law . . . ."); *see, e.g.*, *United States v. Ivory*, 532 F.3d 1095, 1100 (10th Cir. 2008) (the Fifth Amendment ordinarily "forbids comment by the prosecution on the accused's silence" (ellipsis and internal quotation marks omitted)).)

In general, we would think that the proper standard is abuse of discretion, because the trial court's familiarity with the trial is a great advantage in assessing whether a closing argument was fair. A trial judge, who "is present in the courtroom throughout the proceedings, . . . is uniquely positioned to assess the prejudicial effect of an improper argument in the context of the overall trial, as well as to fashion an appropriately tailored remedy," although appellate courts have the advantage of time and "the opportunity to consider how individual cases fit in the context of a wider stream of . . . precedent." *Whittenburg*, 561 F.3d at 1128; *see id.* ("In this light, our job is not to grade closing arguments, but it is to police the outer boundaries of permissible argument."). In this case, however, we need not choose the standard of review because on de novo review we can reject Defendant's challenge.